**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOHN BEJARANO,

*Petitioner-Appellant*,

v.

WILLIAM REUBART, Warden,

*Respondent-Appellee*.

No. 11-99000

D.C. No.
2:98-cv-01016-
PMP-RJJ

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted January 23, 2024
Pasadena, California

Filed May 2, 2025

Before: Kim McLane Wardlaw, Johnnie B. Rawlinson,
and Ryan D. Nelson, Circuit Judges.

Opinion by Judge R. Nelson;
Concurrence by Judge Wardlaw

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of John Bejarano's habeas corpus petition challenging his Nevada conviction and death sentence for first-degree murder, robbery, and other felonies.

In his first certified claim, Bejarano argued that the district court wrongly denied him an evidentiary hearing. Under 28 U.S.C. § 2254(e)(2), Bejarano was required to exercise due diligence in developing the factual predicate for his claims of ineffective assistance of trial counsel. He failed to do so when required by state law. The panel held that because that failure is attributable to him, the district court did not abuse its discretion in denying an evidentiary hearing.

In his second certified claim, Bejarano argued that trial counsel was ineffective for failing to investigate and present additional mitigation evidence during the penalty phase of his trial. The panel held that even assuming Bejarano's trial counsel performed deficiently at times by not presenting some pieces of alleged mitigation evidence, Bejarano was not prejudiced by counsel's performance.

In a third set of certified claims, Bejarano argued that his counsel on direct appeal rendered ineffective assistance. The panel expanded the certificate of appealability to encompass the district court's timeliness

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

determinations on these claims. The panel denied some claims because they do not relate back to the original petition, but rejected others on the merits, concluding that the Nevada Supreme Court's rejection of them was not unreasonable.

In a fourth certified claim, Bejarano argued that the Nevada Supreme Court failed to provide adequately close scrutiny of his death sentence. Applying the deferential standards from the Antiterrorism and Effective Death Penalty Act, the panel held that the Nevada Supreme Court provided appropriate appellate scrutiny.

The panel denied Bejarano's request for a certificate of appealability on three other issues because he did not make a substantial showing of the denial of a constitutional right.

Judge Wardlaw concurred except insofar as the majority did not hold that trial counsel's failure to present favorable character witness testimony was deficient. She agreed with the majority's conclusion that the failure to call these character witnesses did not ultimately prejudice Bejarano, but wrote that counsel's failure to present readily available, and helpful, mitigation evidence was deficient performance.

---

**COUNSEL**

David Anthony (argued) and Brad D. Levenson, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Federal Public Defender for the District of Nevada, Las Vegas, Nevada; for Petitioner-Appellant.

Michael J. Bongard (argued) and Jaimie Stilz, Senior Deputy Attorneys General; Aaron D. Ford, Attorney General of

Nevada; Nevada Office of the Attorney General, Las Vegas, Nevada; for Respondent-Appellee.

---

**OPINION**

R. NELSON, Circuit Judge:

In 1987, John Bejarano shot Roland Wright twice in the head. A jury convicted Bejarano of first-degree murder, robbery, and other felonies. During the penalty phase, Bejarano told the jury that they had better "pray to God I don't get out," and that there were other crimes, which they didn't know about, for which he could be executed "five times." The jury sentenced Bejarano to death. The Nevada Supreme Court dismissed Bejarano's direct appeal of his conviction and sentence. Bejarano has filed several unsuccessful post-conviction petitions in state and federal courts.

We affirm the district court's denial of Bejarano's petition for a writ of habeas corpus. First, Bejarano was not reasonably diligent in presenting his proposed evidence to the state courts. Second, even assuming that Bejarano's trial counsel performed deficiently at times by not presenting some pieces of alleged mitigation evidence, we conclude that Bejarano was not prejudiced by counsel's performance.

Third, to consider whether Bejarano's appellate counsel on direct appeal was ineffective, we expand the certificate of appealability. Doing so allows us to review both the district court's procedural bar and timeliness findings. Ultimately, however, Bejarano fails to prove that appellate counsel's performance was ineffective or that Bejarano was

prejudiced. Fourth, applying the deferential standards from the Antiterrorism and Effective Death Penalty Act, the Nevada Supreme Court provided appropriate appellate scrutiny of Bejarano's death sentence.

Finally, we deny Bejarano's request for a certificate of appealability on three other issues because he does not make a substantial showing of the denial of a constitutional right.

# I

## A

In March 1987, John Bejarano robbed and murdered Roland Wright, a Reno cab driver. Sitting in Wright's cab, Bejarano shot Wright twice in the head "execution style" with a .22-caliber sawed-off rifle. After the murder, Bejarano absconded with $250. There were no eyewitnesses to Wright's murder, but .22-caliber casings were later recovered from the cab.

Days later, the police recovered a stolen rental car in downtown Reno. Inside the car, they found .22-caliber ammunition matching the casings found in Wright's cab, a sawed-off rifle butt, a hacksaw blade, and a firecracker. The police also lifted a fingerprint from the car that matched Bejarano's prints. Later, security guards at a nearby casino discovered Bejarano unconscious in a restroom. As they escorted him out, Bejarano reportedly told the security guards that he needed to get his gun because he was wanted for murder, using gestures to mime a person being shot in the head. Shortly after, the security officers contacted the police and helped prepare a composite sketch of Bejarano.

The next day, police officers saw Bejarano looking into parked cars in an area known for vehicle break-ins. They patted him down and found a concealed knife and a pair of

scissors. They arrested him for prowling and carrying a concealed weapon. Bejarano was not carrying identification and gave the officers an alias. But the officers realized he bore a likeness to the composite sketch that had been distributed earlier that day. After bringing Bejarano to the police station, the police searched him and found the keys to the stolen rental car, a key to a hotel, and firecrackers of a similar make and type as that found in the rental car.

While Bejarano was in custody, the police uncovered other evidence tying him to Wright's murder. Robert Kindell, an inmate who was with Bejarano in the holding dorm, claimed that Bejarano admitted shooting Wright twice with a sawed-off .22-caliber rifle. Kindell claimed that Bejarano detailed how, after the second shot, Wright's head fell, and blood spilled from his nose.

Bejarano also told Kindell that he used hollow-point bullets matching those found in the rental car. Bejarano reportedly "laughed like he enjoyed it" as he relayed this information. He explained that he killed Wright to steal $250 from him. And he hid the gun but needed help to destroy it before the police could locate it. Another inmate, Dean Yoder, was present during the conversation and corroborated Kindell's testimony. Eventually, police found the murder weapon. It matched the sawed-off butt of the gun found in the stolen rental car that trial evidence tied to Bejarano.

## B

### 1

The State of Nevada charged Bejarano with first degree murder with a deadly weapon, robbery with a deadly weapon, possession of a firearm as a felon, possession and

disposition of a sawed-off rifle, possession of a stolen motor vehicle, and carrying a concealed weapon. *See* Nev. Rev. Stat. §§ 193.165 (1981), 200.010 (1985), 200.030 (1977), 200.380 (1967), 202.275 (1979), 202.350 (1985), 202.360 (1985), 205.273 (1979). The State also filed a notice of intent to seek the death penalty.

Bejarano appeared at a plea hearing to plead guilty to murder with a deadly weapon. In exchange, the State offered to dismiss the other charges and to recommend a sentence of two consecutive life sentences without parole. During the hearing, however, Bejarano asserted that he could not remember killing Wright, that he did not want to plead guilty to an offense he could not remember, and that he wished to plead not guilty by reason of insanity. Accordingly, the trial court entered a plea of not guilty.

The case proceeded to trial, where Bejarano testified. Bejarano discussed his upbringing in the foster care system and acknowledged two violent felony convictions for aggravated assault. Bejarano also admitted that he was a fugitive when Wright was murdered. He was wanted on "a whole bunch" of charges, including assault of a police officer and assault with a deadly weapon. The jury returned a verdict of guilty as to all charges.

During the penalty phase, the State alleged six aggravating factors:

> (1) that Bejarano committed the murder when he was under a sentence of imprisonment (probation) following convictions in Idaho;
>
> (2) & (3) that he was previously convicted of a felony involving the use or threat of

violence against another (aggravated assault convictions in 1979 and 1981);

(4) that he committed the murder while committing or attempting to commit flight from robbery and knew the victim's life would be taken by lethal use of a deadly weapon;

(5) that he committed the murder to avoid or prevent a lawful arrest because the victim would otherwise be able to identify him and serve as a witness against him for robbery; and

(6) that he committed the murder for the purpose of receiving money or any other thing of monetary value.

*See* Nev. Rev. Stat. § 200.033(1), (2), (4), (5), (6) (1985).

In mitigation, Bejarano's counsel presented Bejarano's child welfare records, GED diploma, and honorable military discharge. Bejarano also testified at the penalty hearing and told the jury that he belonged "in the system." When asked about the possibility of being sentenced to death, Bejarano said, "I could care less, really, to tell you the truth . . . . You found me guilty of first degree murder; you kill me. That's all there is to it . . . . I could really get into it, but that's the decision you should make . . . . No, I was made to be terminated. That's all there is to it."

Bejarano also told the jury that "[y]ou better pray to God I don't get out," and "I mean I'm not going to sit up here and plead for my life." If sentenced to death, Bejarano stated, "I'll probably thank you, you know, because you're doing

me a favor. You're doing everybody else a favor." He added that "[t]here's beaucoup—the other things if you guys ever found out about, I'd be executed five times, you know."

After weighing the aggravating factors against the mitigation evidence, the jury sentenced Bejarano to death for the first-degree murder charge. Bejarano was sentenced to prison terms totaling forty-two years for the remaining counts.

2

The Nevada Supreme Court dismissed Bejarano's direct appeal. *Bejarano v. State*, 809 P.2d 598 (Nev. 1988) (unpublished table decision). It rejected Bejarano's claim that his arrest violated the Fourth Amendment and concluded that "the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Nor was the penalty excessive given the crime and the appellant."

Bejarano then filed his first state post-conviction petition (First PCR). The Nevada trial court held an evidentiary hearing on Bejarano's request for psychiatric evaluations, related incompetency claims, and ineffective assistance of counsel (IAC) claims. The trial court ultimately denied Bejarano's petition, and the Nevada Supreme Court affirmed. *Bejarano v. State*, 801 P.2d 1388, 1390 (Nev. 1990) (per curiam) (*Bejarano I*).

Bejarano then filed a pro se petition for a writ of habeas corpus in federal district court. After the appointment of counsel and limited discovery, Bejarano filed an amended habeas petition and a motion to stay proceedings to exhaust claims in state court. The district court dismissed the petition and denied Bejarano's motion to stay proceedings.

Bejarano was directed to file a new petition after exhausting his claims in state court. Bejarano did not appeal this order.

Bejarano then filed his second post-conviction petition in state court (Second PCR), alleging thirty-five claims. This petition was dismissed in its entirety. The state court concluded that thirty-four of Bejarano's claims were procedurally barred under Nevada law, which requires all available claims to be raised in the first petition. *See* Nev. Rev. Stat. § 34.810 (1989).

Bejarano's remaining claim—that his first post-conviction counsel was ineffective—was rejected on the merits as "a naked allegation," "hypothetical," and "speculative." The Nevada Supreme Court affirmed. *Bejarano v. Warden*, 929 P.2d 922, 926 (Nev. 1996) (*Bejarano II*).

Bejarano filed this action—his second federal habeas petition—in 1998. Five years later, Bejarano amended that petition. The district court granted a stay to allow Bejarano to exhaust additional claims in state court. While his second federal habeas petition was stayed, Bejarano filed his third state post-conviction petition (Third PCR) in the Nevada trial court in 2003. The trial court denied this petition as untimely. *See* Nev. Rev. Stat. § 34.726 (1991).

The Nevada Supreme Court affirmed. *Bejarano v. State*, 146 P.3d 265, 277 (Nev. 2006) (*Bejarano III*). The Nevada Supreme Court excused Bejarano's procedural default as to one claim and considered that claim on the merits. *Id.* at 269–**7**1. It invalidated two of the six aggravating factors that were used to support Bejarano's death sentence: the robbery felony aggravator and the receiving money aggravator. *Id.* at 274–75 (citing Nev. Rev. Stat. § 200.033(4), (6) (1985)).

The court then reweighed the four remaining valid aggravators and determined that Bejarano's death penalty was still supported.  *Id.* at 275–77.  The Nevada Supreme Court concluded that "[i]t is clear beyond a reasonable doubt that absent the invalid aggravators the jury would have still sentenced Bejarano to death.  Bejarano is therefore not entitled to any post-conviction relief."  *Id.* at 277.  The Nevada Supreme Court then denied rehearing.

Following this round of state-court proceedings, the stay in Bejarano's federal habeas proceeding dissolved, and Bejarano filed a second amended petition for a writ of habeas corpus (SAP) in 2007.  That is the operative petition.  A year later, the district court dismissed many of Bejarano's claims as unexhausted, time-barred, or procedurally defaulted, and denied Bejarano's motion for an evidentiary hearing.  Bejarano again moved for an evidentiary hearing on his remaining claims, but his motion was denied.

The district court denied Bejarano's four claims on the merits and reiterated that he was not entitled to an evidentiary hearing.  *Bejarano v. McDaniel*, 2:98–CV–1016–PMP–RJJ, 2010 WL 3522374, at *3, *17–41 (D. Nev. Sept. 1, 2010) (*Bejarano IV*).  The court granted Bejarano a certificate of appealability as to the denial of an evidentiary hearing and some of his ineffective assistance of trial counsel claim.  *Id.* at *22.  The district court denied his motion to alter or amend the district court's judgment, seeking a certificate of appealability as to five additional issues.

Bejarano appealed in December 2010.  We ordered a limited remand for the district court to consider whether *Ha Van Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013), *abrogated in part by Davila v. Davis*, 582 U.S. 521 (2017),

and *Martinez v. Ryan*, 566 U.S. 1 (2012), warranted reconsideration of Bejarano's trial and appellate IAC claims. We also suggested that the district court reconsider whether Bejarano was entitled to an evidentiary hearing.

On remand, the district court concluded that some but not all Bejarano's appellate IAC claims related back to his timely 1998 petition. *Bejarano v. Baker*, 2:98–CV–1016, 2015 WL 4038790, at *1–5 (D. Nev. July 2, 2015) (*Bejarano V*). It denied the remaining claims on the merits. *Id.* The district court determined that the trial IAC claim was not procedurally barred because Bejarano presented it in state court. *Id.* at *6–8.[1] The district court also reaffirmed that § 2254(e)(2) barred an evidentiary hearing on the trial IAC claim. *Id.*

The matter returned to this court, and we again granted Bejarano's request to stay appellate proceedings while he exhausted another claim (relating to the Nevada Supreme Court's reweighing of his sentence) in state court. While the appeal was stayed, Bejarano filed another motion for reconsideration in the district court, requesting reconsideration of its dismissal of multiple claims on timeliness grounds. The district court denied the motion. *Bejarano v. Gittere*, 2:98–cv–01016, 2020 WL 403719, at *1 (D. Nev. Jan. 23, 2020).

After this fourth round of state post-conviction proceedings, we lifted the stay. We also expanded the certificate of appealability to consider whether some of

---

[1] We have held that "*Martinez* does not apply to claims that were not procedurally defaulted, but were, rather, adjudicated on the merits in state court." *Detrich v. Ryan*, 740 F.3d 1237, 1246 (9th Cir. 2013) (en banc), *overruled on other grounds by Shinn v. Ramirez*, 596 U.S. 366 (2022).

Bejarano's claims were procedurally barred and whether the Nevada Supreme Court failed to scrutinize his death sentence.[2]

## II

We review the district court's denial of a habeas petition de novo and its findings of fact for clear error. *Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010).  Because the federal petition was filed after April 24, 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) governs our review.  *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

## A

Under AEDPA, habeas relief may be granted only if the state court's decision was (1) "contrary to" or an "unreasonable application of" Supreme Court precedent, or (2) based on an "unreasonable determination" of the facts. 28 U.S.C. § 2254(d).

A state court's decision is "contrary to" Supreme Court precedent if it applies a legal rule "opposite" to that established by the Court or if it decides a case differently from the Court on "materially indistinguishable facts." *Terry Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  A state court's decision is an "unreasonable application" of Supreme Court precedent if no "fairminded jurist" could

---

[2] Subsequently, the Supreme Court decided *Shinn v. Ramirez*, 596 U.S. 366 (2022).  *Shinn* held that, under 28 U.S.C. § 2254(e)(2), "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."  596 U.S. at 382.  At Bejarano's request, we allowed him to brief the possible impact of that opinion on Bejarano's certified claims.

deem it an appropriate application of that precedent. *Brown v. Davenport*, 596 U.S. 118, 135–36 (2022).

Through it all, only "extreme malfunctions" of the justice system qualify for habeas relief under AEDPA. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citation omitted). That is, we defer to a state court's merits decision unless that decision "was so lacking in justification" that its error is "beyond any possibility for fair minded disagreement." *Id.* at 103. We apply this highly deferential standard to the last reasoned state court decision on the merits. *Wilson v. Sellers*, 584 U.S. 125–26, 131–33 (2018).

B

As to the uncertified issues, we construe a petitioner's briefing of these issues as a motion to expand the district court's grant of a certificate of appealability. *Floyd v. Filson*, 949 F.3d 1128, 1152 (9th Cir. 2020) (citing 9th Cir. R. 22-1(e)). We expand a certificate of appealability only if the applicant makes "a substantial showing" that he was denied a constitutional right. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (quoting § 2253(c)(2)). A showing is "substantial" if "jurists of reason" could disagree with the district court's resolution of the claim or could conclude that the issues presented "are adequate to deserve encouragement to proceed further." *Id.*

That said, we are limited "to a threshold inquiry into the underlying merit of the claims." *Buck v. Davis*, 580 U.S. 100, 116 (2017) (cleaned up). That threshold inquiry "should be decided without full consideration of the factual or legal bases adduced in support of the claims." *Id.* at 115 (cleaned up).

## III

## A

We begin with Bejarano's certified claims. First, Bejarano argues that the district court wrongly denied an evidentiary hearing. Even though the state trial court conducted an evidentiary hearing on Bejarano's IAC claims, he argues that a second, federal, evidentiary hearing was needed to develop the factual basis for his claim that trial counsel was ineffective for failing to present mitigating evidence. *See* § 2254(e)(2)(A)(ii).

We review de novo the district court's interpretation of AEDPA's standards. *Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005) (citation omitted). We review for an abuse of discretion the district court's "ultimate denial of an evidentiary hearing based on these AEDPA standards." *Id.* (citation omitted). Because Bejarano failed to diligently present his claims to the state court, the district court did not abuse its discretion.

Generally, AEDPA does not allow federal courts to consider claims that were "not presented to the state courts 'consistent with [the State's] own procedural rules.'" *Shinn*, 596 U.S. at 378 (alteration in original) (quoting *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)).

The district court concluded that the evidence Bejarano sought to offer was available when he filed his First PCR. And § 2254(e)(2)(A)(ii) bars an evidentiary hearing unless it is based on a "factual predicate that could not have been previously discovered through the exercise of due diligence." Thus, § 2254(e)(2) barred a second evidentiary hearing.

Later, on remand from this court in 2014, the district court again concluded that § 2554(e)(2) barred an evidentiary hearing. Bejarano again moved for reconsideration, and his motion was denied. *See Bejarano v. Baker*, 2:98-CV-1016-GMN-NJK, 2016 WL 1169443 (D. Nev. Mar. 22, 2016) (*Bejarano VI*).

The court pointed to Bejarano's admission that the information necessary to factually develop his claim was available at the time of his first state petition, but Bejarano did not exercise due diligence in developing and presenting that evidence. *Id.* at \*1 (citing *Michael Williams*, 529 U.S. 420, 437 (2000)). Separately, the court held that "diligence" under § 2254(e)(2)(A)(ii) should be measured by Bejarano's conduct at the proceedings on his first state petition rather than his second. *Bejarano VI*, 2016 WL 1169443, at \*1–2.

On appeal, Bejarano argues that the district court erred in three ways. First, it should have ignored his conduct leading up to his First PCR. Second, his attorney's negligence in presenting the IAC claims should be excused. And third, his counsel's lack of diligence should be attributed to the state, not to him. We reject these arguments.

### 1

To begin with, we disagree with Bejarano that AEDPA demands that we look to the second state petition proceedings rather than the first. Bejarano cites our circuit's statements that, under AEDPA, we look to "a single state court decision, not to some amalgamation of multiple state court decisions." *Rogers v. McDaniel*, 793 F.3d 1036, 1043 n.4 (9th Cir. 2015) (quoting *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005)).

That is true but irrelevant.  Both *Rogers* and *Barker* dealt with state-court merits determinations under § 2254(d), not a request for an evidentiary hearing under § 2254(e)(2).  *See Rogers*, 793 F.3d at 1041; *Barker*, 423 F.3d at 1088.  Neither demanded that we disregard Bejarano's lack of diligence during his first state post-conviction proceedings—when he first had the opportunity to introduce the evidence he now seeks to admit.

The proper standard for evaluating whether a petitioner failed to exercise diligence "require[s] in the usual case that the prisoner, at a minimum, seek an evidentiary hearing *in state court in the manner prescribed by state law*."  *Michael Williams*, 529 U.S. at 437 (emphasis added).  And under Nevada law at the time, Bejarano should have introduced the evidence during his first post-conviction proceedings.  *Pellegrini v. State*, 34 P.3d 519, 527–28 (Nev. 2001) (per curiam), *abrogated on other grounds by Rippo v. State*, 423 P.3d 1084, 1097 n.12 (Nev. 2018); *see also* Nev. Rev. Stat. § 34.810(3) (1985).  In other words, contrary to Bejarano's argument, Nevada law did not give him two bites at the apple in developing the factual predicate for his claims.

We acknowledge that between 1967 and 1993, Nevada prisoners could seek post-conviction relief under Chapter 177 and habeas corpus under Chapter 34 of the Nevada Revised Statutes.  *Valerio v. Crawford*, 306 F.3d 742, 749 n.1 (9th Cir. 2002) (en banc).  But even so, state law prohibited prisoners from filing successive petitions with claims they could have raised in earlier proceedings.  *Pellegrini*, 34 P.3d at 527–28.

The Nevada Supreme Court relied on that procedural bar when it dismissed claims in Bejarano's Second PCR.  *Bejarano II*, 929 P.2d at 925–26.  And it chastised Bejarano

for using "continuous petitions for relief . . . without a legal foundation" to "thwart[] imposition of [the] ultimate penalty." *Id.* at 925. Thus, as a matter of state law, Bejarano was obligated to diligently develop the factual predicate for those claims in the evidentiary hearing on his First PCR. *Id.* at 926; *see also* Nev. Rev. Stat. § 34.810(3) (1985). Neither Nevada's once-bifurcated statutory regime nor our practice of looking to the last reasoned state-court decision when evaluating the merits excuse Bejarano's failure to do so.

2

With this framework in mind, we conclude that Bejarano, during the First PCR proceedings, failed to exercise due diligence in developing the factual predicate for his IAC mitigation claim. Bejarano's counsel failed to diligently present all available evidence in the evidentiary hearing provided during that proceeding, and that failure can be attributed to Bejarano.

Bejarano has repeatedly conceded that the new evidence he wants to present was known or available to his counsel during proceedings on the First PCR. Bejarano's counsel "was literally spoon-fed compelling mitigation information by prior defense counsel," and Bejarano's counsel admitted as much in previous proceedings. In addition, "literally a treasure trove" of evidence was available to First-PCR counsel. Despite the availability of this evidence, Bejarano's counsel failed to present it during Bejarano's First PCR proceedings. Thus, "there was a failure within the meaning of § 2254(e)(2) and the restrictions of that section therefore

apply." *McLaughlin v. Oliver*, 95 F.4th 1239, 1250 (9th Cir. 2024) (cleaned up).[3]

That failure is attributable to Bejarano.  *Shinn*, 596 U.S. at 383.   As *Shinn* makes clear, the negligence of postconviction counsel in presenting or supporting federal claims in state postconviction hearings cannot be excused in situations like this one.  *Id*. at 382–83.  Thus, a federal court may not expand an evidentiary record just because an attorney failed to follow state law in investigating and expanding the record.  *Id.* at 384; *accord Lee v. Thornell*, 108 F.4th 1148, 1156 (9th Cir. 2024) (a habeas petitioner must comply with the "requirements of section 2254(e) when presenting new evidence on the merits" of trial IAC claims).

3

Finally, Bejarano is not excused from § 2254(e)(2)'s diligence requirement because of state action.  Bejarano first suggests that his counsel was provided insufficient time to gather evidence before the First PCR evidentiary hearing because counsel had only twenty days to file the petition. But the evidentiary hearing on the IAC mitigation claim was held six months after the First PCR was filed, and Bejarano has repeatedly asserted that all the relevant evidence was

---

[3] In *McLaughlin*, we declined to consider a petitioner's new evidence in connection with the merits of his trial-counsel IAC claim.  95 F.4th at 1250.  Even though the petitioner attempted to develop his claims by filing successive state post-conviction petitions, they were procedurally barred.  *Id*.  This procedural bar meant that the petitioner was not "in compliance with state procedural rules," so he failed "to develop the factual basis of a claim in State court."  *Id*. at 1249 (cleaned up).  Further, because a failure of the petitioner's postconviction counsel resulted from the petitioner himself, he could not escape § 2254(e)(2).  *Id.* at 1250.

known or available to his counsel at that time. *Bejarano IV*, 2010 WL 3522374, at *3–4. Thus, Bejarano's focus on the twenty-day filing deadline is misplaced. Considering all the time Bejarano had to prepare, Bejarano's counsel could have gathered and presented his evidence.

Bejarano also argues that the State failed to provide him with adequate counsel and resources so that he could present more favorable expert evidence. This position, however, unduly shifts responsibility to the State for Bejarano's post-conviction counsel's own deficiencies. This conflicts with *Shinn*, which affirmed that, for purposes of determining failure to present or support claims in state court under § 2254(e)(2), any attorney negligence is attributed to Bejarano, not the State. 596 U.S. at 383.

At bottom, Bejarano failed to establish that State action, rather than his post-conviction counsel's inaction, caused his counsel's failure to present all available evidence in the First PCR proceedings.

*        *        *

In conclusion, Bejarano's first certified claim is non-meritorious. Under 28 U.S.C. § 2254(e)(2), Bejarano was required to exercise due diligence in developing the factual predicate for his trial IAC claims. He failed to do so when required by state law. Because that failure is attributable to him, the district court did not abuse its discretion in denying an evidentiary hearing.

And, as discussed below, the district court, considering the newly proffered evidence, concluded that Bejarano's IAC mitigation claim failed. We agree that, even considering that evidence, Bejarano's claim fails, and thus

any hypothetical error stemming from the denial of an evidentiary hearing was harmless.

## B

We turn now to Bejarano's second certified claim, that his trial counsel was ineffective for failing to investigate and present additional mitigation evidence during the penalty phase of his trial. The Nevada Supreme Court has denied this claim on the merits. *Bejarano I*, 801 P.2d at 1390. Accordingly, the claim as presented in the First PCR is subject to AEDPA review. *See* § 2254(d).

Bejarano also presented a claim in his Second PCR that "[t]rial counsel failed to present any significant mitigating evidence." The Nevada Supreme Court found this claim successive under Nev. Rev. Stat. § 34.810 (1989) and dismissed it. The district court reviewed it de novo, however, after determining that the successive-procedural bar was inadequate. *See Sechrest v. Ignacio*, 549 F.3d 789, 803 (9th Cir. 2008) (citing *Valerio*, 306 F.3d at 778). We agree with the district court and review this claim from the Second PCR de novo. *Id.* At bottom, however, both claims fail.

## 1

IAC claims are considered under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "To establish ineffective assistance under *Strickland*, a [petitioner] must demonstrate that: (1) counsel's 'performance was deficient'; and (2) counsel's 'deficient performance prejudiced the defense.'" *Andrews v. Davis*, 944 F.3d 1092, 1108 (9th Cir. 2019) (en banc) (quoting *Strickland*, 466 U.S. at 687).

"To establish deficient performance, a petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). "Counsel in a death-penalty case has 'a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Andrus v. Texas*, 590 U.S. 806, 814 (2020) (per curiam) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).

Because both counsel's strategic decisions and a state court decision denying an IAC claim independently warrant deference, AEDPA analysis of *Strickland*'s deficient-performance prong is "doubly deferential." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (per curiam) (citation omitted); *see also Sexton v. Beaudreaux*, 585 U.S. 961, 968 (2018) (per curiam) ("deference to the state court [is] near its apex in [such a] case").[4]

"With respect to prejudice, a [petitioner] must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 694). Under our doctrine, "the cumulative effect of multiple errors may prejudice a defendant even if no single error in isolation is sufficient to establish prejudice," meaning that prejudice resulting from ineffective assistance of counsel must be 'considered collectively, not item by item.'" *Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018) (quoting *Doe v. Ayers*, 782

---

[4] "Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (cleaned up).

F.3d 425, 460 n.62 (9th Cir. 2015); *accord Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir. 2002).

"Establishing prejudice in the death sentence context requires a showing that there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Bible v. Ryan*, 571 F.3d 860, 870 (9th Cir. 2009) (cleaned up); *see also Washington v. Shinn*, 46 F.4th 915, 930–31 (9th Cir. 2022). "[I]t is enough to show 'a reasonable probability that at least one juror' would have recommended a sentence of life instead of death." *Andrews*, 944 F.3d at 1108 (quoting *Wiggins*, 539 U.S. at 537).

2

As to claims made in his First PCR, Bejarano argues that his trial counsel's performance was deficient because no mitigation evidence was presented to the jury other than Bejarano's own testimony and some records about Bejarano's childhood. Bejarano further argues that trial counsel's closing argument was deficient, due in part to a lack of investigation and preparation for the penalty phase.

The Nevada state courts' denial of this IAC claim was not "contrary to" or an "unreasonable application of" Supreme Court precedent. *See Richter*, 562 U.S. at 98, 100–01. The Nevada trial court determined that counsel made significant—although unsuccessful—efforts to locate witnesses who could have provided favorable testimony. That finding was supported by the testimony of trial counsel during the evidentiary hearing and was uncontradicted by Bejarano. The court recognized that "[c]ounsel cannot be faulted for putting forth mitigating evidence when none existed."

The Nevada Supreme Court affirmed. *Bejarano I*, 801 P.2d at 1390. In affirming, it considered sua sponte whether counsel was ineffective for failing to present additional mental health evidence based on the evidence submitted during a postconviction evidentiary hearing. *Id*. The court determined that counsel made a tactical decision not to present evidence about Bejarano's low-intelligence and antisocial personality disorder (APD) diagnoses. *Id*. It reasoned that the evidence "may have inflamed the jury even more." *Id*.

That decision was reasonable. We have repeatedly noted the potential pitfalls of presenting a jury with evidence that a defendant suffers from APD, especially if the diagnosis is unaccompanied by evidence of an organic brain injury or other major mental health diagnosis. *See Sanchez v. Davis*, 994 F.3d 1129, 1148 (9th Cir. 2021) (describing an APD diagnosis as a "basket of cobras" before a jury, being potentially more harmful than helpful during the penalty phase (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997))).

The Supreme Court has also recognized the potential negative effects of such evidence and how the prosecution can use it to paint a picture of incorrigibility to the jury. *See Cullen v. Pinholster*, 563 U.S. 170, 193, 201 (2011); *accord Atkins v. Virginia*, 536 U.S. 304, 321 (2002). Presenting the APD diagnosis could have supported the prosecution's presentation of Bejarano as more dangerous than might be suggested by Wright's murder alone. It could have amplified Bejarano's self-professed lack of remorse over the killing or otherwise opened the door to rebuttal evidence strengthening the State's case. *See Pinholster*, 563 U.S. at 201; *see also Wong v. Belmontes*, 558 U.S. 15, 24–25 (2009) (per curiam). And the experts agreed that Bejarano's

condition was unlikely to be successfully treated, which would likely have supported a penalty of death. This conclusion was amplified when considering Bejarano's statement that if the jury gave him a life sentence, he would eventually get out.

Moreover, nothing in the record suggests that the proposed mitigation evidence, if considered, could have reasonably changed the outcome of the trial. Thus, considering the evidence collectively, there was no prejudice. *Richter*, 562 U.S. at 111–13; *Doe*, 782 F.3d at 460 n.62. Bejarano's testimony reinforced the impression of a remorseless, habitual killer. For example, he alluded to other crimes—crimes that, if "you guys ever found out about," Bejarano told the jury, he would be "executed five times[.]" *See Pinholster*, 563 U.S. at 193 (trial counsel did not render deficient performance when the defendant himself boasted about his criminal record). It is not reasonably probable that including evidence of Bejarano's mental condition would have changed the jury's impression of him.[5]

Therefore, the Nevada Supreme Court's denial of Bejarano's IAC mitigation claim in his First PCR was not contrary to or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts. § 2254(d); *see Richter*, 562 U.S. at 102–03.

---

[5] Further, the record on the First PCR did not lay out what potential character witnesses would or could have been called that may have been beneficial to the defense.

3

In his Second PCR, Bejarano asserted that, had trial counsel adequately investigated and planned for the penalty phase, counsel would have presented (1) additional juvenile and social services records, (2) testimony from witnesses such as his juvenile probation officer and others who knew Bejarano during a brief period of stability when he lived in Idaho, and (3) additional mental health evidence. Reviewing these issues de novo, and assuming that Bejarano's trial counsel performed deficiently at times, we conclude that Bejarano was not prejudiced by counsel's performance.

a

Bejarano first argues that trial counsel needed to present juvenile records. But trial counsel did present some of Bejarano's childhood welfare records during the penalty phase. "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam); *see also Strickland*, 466 U.S. at 689.

Bejarano argues that if trial counsel presented additional childhood welfare records, jurors would know that he was raised by an abusive alcoholic father and that he left home due to his father's abuse. Trial counsel could also have shown the "negative [e]ffect[s]" of "neurological impairments, low intelligence, and childhood deprivations." He argues that this evidence could have mitigated some of the prior offenses introduced against him at the penalty phase.

But any evidence about Bejarano's childhood would have been cumulative of evidence already admitted and

would not have made a meaningful impact. *See Runningeagle v. Ryan*, 825 F.3d 970, 985 (9th Cir. 2016) (concluding that new mitigation evidence that "does not materially expand upon what was already before the sentencing court" would not have "affected the balance of mitigating against aggravating circumstances").

Other evidence from the juvenile welfare records—raised first in federal court—showed that Bejarano may have suffered from neurological impairment at a young age. But this newly discovered theory was not supported by experts or evidence in the First PCR evidentiary hearing, nor was counsel on notice of its existence after a reasonable investigation. Thus, trial counsel should not be considered deficient for failing to discover it. *Crittenden v. Ayers*, 624 F.3d 943, 967 (9th Cir. 2010).

In any case, Bejarano was not prejudiced by its omission. In fact, introducing the evidence may have harmed his defense. *See Runningeagle*, 825 F.3d at 987–88. The other evidence not presented may have enabled the prosecutor to paint a picture of Bejarano as angry and withdrawn from a young age—violent, emotionless, remorseless, and prone to violent assault and theft. Likewise, evidence that Bejarano was an alcoholic from a young age could have proven more harmful than helpful to the defense, potentially suggesting that Bejarano was simply "beyond rehabilitation." *See Pinholster*, 563 U.S. at 201.

And the welfare records described Bejarano as a "volcano" who would lash out in anger and hurt himself or someone else. They characterized him as someone who could not handle negative interactions without violence, and as someone who had rejected opportunities to stabilize his life and who did not want to be helped. They even revealed

that Bejarano, unsupervised as a child, may have once set fire to the family home.

No doubt this evidence would have strengthened the prosecution's portrayal of Bejarano as a remorseless killer and likely harmed the mitigation effort more than it helped. *See id.*; *Hooper v. Shinn*, 985 F.3d 594, 630 (9th Cir. 2021). Thus, trial counsel's reasonable tactical decision to omit these records was not deficient performance. *See Strickland*, 466 U.S. at 690 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.").

For the same reasons that counsel could have decided not to admit the other welfare records, Bejarano cannot show that their omission prejudiced him. To the contrary, as discussed, admitting the records may well have supported the death sentence. Thus, trial counsel's failure to introduce additional juvenile welfare records was neither deficient nor prejudicial by itself or when viewed within the postconviction record.

b

Second, Bejarano argues that trial counsel performed deficiently because he failed to investigate and present additional witnesses. These witnesses include his juvenile probation officer, workers at his juvenile youth center, and others that knew him as a young adult. In any event, trial counsel generally did contact these witnesses, either in person or through an investigator, and the decision not to call them was reasonable. Some of these witnesses may have presented harmful testimony that outweighed any potential benefit. And, in any case, Bejarano has not established a reasonable probability of a different outcome at sentencing

if these potential witnesses had testified.  *See Washington*, 46 F.4th at 930–31.

i

The first person at issue is Vonnie Franks, Bejarano's juvenile probation officer.  Bejarano argues that Franks could have corroborated certain favorable mental health evidence.  So, Bejarano argues, counsel was ineffective in failing to investigate and present Franks's testimony.

But trial counsel spoke with Franks and reasonably determined that her testimony would support a sentence of death.  Trial counsel stated that Franks would testify about "certain fixations regarding homicide" that Bejarano had as a child and concluded that this testimony would be damning.  Bejarano himself later agreed that calling Franks would not be a good idea and stated that he no longer desired to call Franks.  Thus, the trial record reflects that counsel made a tactical decision against calling Franks after weighing the possible benefits and harm of her testimony.

The evidence submitted with the Second PCR reaffirms that not calling Franks was a reasonable tactical decision.  Franks submitted a 1992 declaration, included with the Second PCR and the federal habeas petition, in which she recalled that Bejarano had significant anger issues from a young age that he never managed.  Although she praised Bejarano's childhood potential and abilities, she also acknowledged that she may have "scared [Bejarano's] attorney away" by acknowledging that she "always feared [Bejarano] might do something" like murder.  In fact, when Franks was called about Bejarano, her initial response was: "Who did he kill?"

Building on these concerns, Franks described that Bejarano showed morbid interest in a news account of a young girl's death in Riverside. Bejarano discussed the murder in such graphic terms that it "really worried" Franks and, afterward, she thought "some day he might erupt." Although she told the attorney she would be willing to testify, Franks did not hear from the attorney again.

Bejarano's first trial counsel recalled that Franks had told him that Bejarano had "gruesome fantasies" about killing someone and repeatedly gave Franks details about the girl's slaying. Counsel thus believed that Franks's testimony would be devastating to Bejarano, and he relayed this assessment to replacement counsel. Additionally, Bejarano himself told the trial court that after thought and reflection, he did not want to call Franks.

Accordingly, trial counsel reasonably determined that Franks's testimony "would be another nail in the coffin[.]" And for the same reasons, there is not a reasonable probability that Franks's testimony would have resulted in a sentence of less than death, either by itself or when viewed within the postconviction record. *See Strickland*, 466 U.S. at 695.

ii

The next potential witness was Father Matthew Costello. Trial counsel retracted an earlier request to have Father Costello testify as a witness because the priest had limited interactions with Bejarano. Father Costello worked at the Hanna Boys Center, where Bejarano lived for a time as a child. At first, trial counsel thought he would make a good witness.

But Father Costello later revealed that he was confused as to whom they were talking about.  Bejarano was not "the good kid" he had been telling trial counsel about.  Instead, Father Costello remembered Bejarano as a loner and troublemaker and said that he barely knew him.[6]  Thus, the decision not to call Father Costello was a reasonable tactical decision.  Father Costello's testimony likely would have backfired on Bejarano.  Here, too, that establishes neither deficient performance nor prejudice.  *See Strickland*, 466 U.S. at 690.

iii

Bejarano claims his counsel also should have introduced a declaration from Mary Nowicki, a caseworker who worked at the Hanna Boys Center during Bejarano's time there.  Nowicki stated that she was never contacted by trial attorneys and that she would have been willing to testify if she had been asked.

Nowicki reported that she remembered Bejarano as quiet and unwilling to confide in anyone.  She had memories of him being kind and withdrawn, and of giving her a present.  She also remembered that he avoided getting into trouble, but that he was a loner and "never had any friends."  Yet she also described Bejarano as "a very deprived . . . [and] damaged child" and, like Franks, felt that he was already beyond her help by the time she met him.  Because Bejarano turned inward and shunned outside help, she "was not at all surprised" to later learn that Bejarano became an alcoholic.

Although this declaration provided a sympathetic description of Bejarano many years later, it omitted many of

---

[6] Trial counsel lamented that he struggled to find a single witness to say good things about Bejarano, "including the priest."

Nowicki's contemporaneous observations that could have proven very damaging to Bejarano. For example, when Bejarano ran away from the Hanna Center, Nowicki wrote to Bejarano, explaining that she thought he "ha[d] an awful lot of anger stored up inside of [him] that [he] will have to get rid of someday." She also suggested that Bejarano had, as of then, not learned to cope with that anger—and suggested that he was choosing to make things worse, rather than improve.

Thus, it is not reasonably probable that calling Nowicki to testify would have led to a different sentencing outcome. For one, Nowicki's testimony would not be limited to her sympathetic declaration; prosecutors could have cross-examined her about her letter and her view that Bejarano was full of anger and not accepting help. On balance, that evidence could have supported the jury's sentencing decision. For another, Nowicki's perspective that Bejarano had a troubled childhood and was friendless would be cumulative of similar evidence already presented. *See Runningeagle*, 825 F.3d at 985–86. Likewise, evidence that Bejarano was an alcoholic from a young age could have proven more harmful than helpful to the defense, potentially suggesting the Bejarano was simply "beyond rehabilitation." *Pinholster*, 563 U.S. at 201.

And her testimony probably would not have been "so persuasive that it would have meaningfully altered the jury's view of the case." *Staten v. Davis*, 962 F.3d 487, 498 (9th Cir. 2020). Finally, weighed against the horrible facts of Bejarano's crime and his troubling warning to the jury that "[y]ou better pray to God I don't get out," Nowicki's testimony that Bejarano, ten years earlier, was troubled and sympathetic is unlikely to have made a difference. On these facts, deciding not to call Nowicki was neither deficient nor

prejudicial viewed either in isolation or within the postconviction record. *See Strickland*, 466 U.S. at 695.

iv

Next, Bejarano contends that his trial counsel should have called Virginia Greathouse and Ben Wenke. Greathouse was an elderly woman with whom he lived for seven or eight months (including during a period of sobriety) after his second aggravated assault conviction. Bejarano cared for Greathouse after the death of her husband, who apparently also felt warmly toward Bejarano. Bejarano performed yard and maintenance work for Greathouse and her daughters. Greathouse also considered Bejarano trustworthy. She recalled his help when her husband was sick, and he also promptly repaid her the $90 loan she made him. She did not know any of his friends or anything about his social life but knew the pastor with whom he went to church regularly.

During her deposition, Greathouse revealed that she knew Bejarano was charged with assaulting a police officer in Boise. She was unaware, however, that this charge stemmed from Bejarano's assault on a woman, and instead believed—apparently based on Bejarano's representations to her—that Bejarano had accidentally struck a police officer during a bar fight.

Counsel was at least aware that Greathouse could attest to a few years of stability and could testify positively about Bejarano. Even so, counsel decided not to introduce her testimony. Trial counsel recalled that Bejarano gave him a list of potential witnesses and remembered that he spoke to Greathouse. Although he had no clear recollection, he admitted that she may have made a good mitigation witness.

He doubted, however, that her testimony would have made much of a difference.

Like Virginia Greathouse, Ben Wenke might have testified positively about Bejarano. Wenke had performed rescue mission work for years. It was through this work that he met and became friends with Bejarano. Unlike anyone else he had worked with, he allowed Bejarano to stay in his house and gave him the keys to his vehicles and home. Wenke recalled riding motorcycles with Bejarano. Throughout this time, Bejarano became close with Wenke's wife and children.

Wenke acknowledged that he was contacted by trial counsel after his family moved from Idaho to Wichita, Kansas. Wenke and his family were prepared to testify for Bejarano if called, but they were not called. Wenke eventually called the investigator and learned that Bejarano had been sentenced to death. The entire family was devastated.[7]

Although Wenke moved across the country, his mother's phone number remained the same, and he could have been contacted through that number. Four years after Bejarano's conviction, trial counsel could not recall details and was confused about Wenke. He was aware of Wenke but, given the transient nature of Wenke's work, claimed it was impossible to reach him. In any event, he believed that the

---

[7] In his operative federal petition, Bejarano included 2007 declarations from Wenke and Wenke's daughter. These declarations were not a part of the evidence that Bejarano submitted to the Nevada state courts with the Second PCR. Therefore we may not consider them. *See Pinholster*, 563 U.S. at 180–81.

Wenke family's testimony would not have made a difference in the outcome.

As with Greathouse, it is unclear from the record what tactical concerns motivated trial counsel not to call Wenke to testify during the sentencing phase.  Trial counsel was aware of both witnesses, and that these witnesses would testify for Bejarano.  Even assuming the decision not to call them was deficient, however, this failure was not prejudicial.

Under *Strickland*, the failure to present mitigating evidence consisting of "numerous people who knew respondent [who] thought he was generally a good person" is not necessarily prejudicial because those witnesses could be cross-examined using the defendant's prior offenses.  466 U.S. at 699–700.  Greathouse and Wenke could have been cross-examined about their knowledge of Bejarano's violent crimes immediately before and after the time he spent in their company.  *See Bejarano IV*, 2010 WL 3522374, at *15–18.  Given the lack of prior cross-examination during an adversarial proceeding, it would be wrong to overestimate the positive value of their testimony.

That is especially true given the "overwhelming aggravating factors" here.  *Strickland*, 466 U.S. at 700.  As the Nevada Supreme Court and district court noted, the evidence supporting the aggravating factors was strong, and some of the most damning information during the penalty phase came from Bejarano himself.  Bejarano counters that he would not have testified at sentencing had counsel presented favorable character witness testimony.  But this argument is mere speculation and lacks any record support.

The record instead shows that Bejarano likely would have testified even if Wenke and Greathouse did.  Even years after sentencing, Bejarano recounted that he saw no

point in showing remorse for a murder he claimed not to remember. Given the quantity and nature of the evidence adverse to Bejarano—including Bejarano's own testimony that the jury had better "pray to God I don't get out," and that there were other crimes, which they didn't know about, for which Bejarano could be executed "five times"—as well as the potential for negative cross-examination, there is no reasonable probability that any juror would have voted against the death penalty. *See id.* Thus, there was no prejudice from excluding these witnesses either in isolation or when viewed in the context of the entire postconviction record. Additionally, any mitigating value from this testimony would be outweighed by the valid aggravating factors.

c

On top of the failure to call certain witnesses, Bejarano argues that trial counsel failed to present mental health evidence, including evidence reflected in later evaluations performed by Dr. Lewis Etcoff and Dr. Charles Dickson. It was neither deficient nor prejudicial for counsel not to conduct these types of evaluations.

i

Bejarano's federal habeas counsel retained Dr. Lewis Etcoff to conduct a neuropsychological evaluation of Bejarano in 1992. So Dr. Etcoff's report was unavailable to Bejarano's trial counsel since he was retained only by Bejarano's federal habeas counsel. *See Crittenden*, 624 F.3d at 967. Therefore, because the report did not exist at trial, trial counsel was not ineffective for failing to use it. The question is instead whether trial counsel was ineffective for failing to hire an expert to conduct a neuropsychological exam. Here, trial counsel did not perform deficiently. Trial

counsel did consult two separate medical experts, Doctors Kenneth Clark and William Thornton, for Bejarano's competency. Counsel then went a step further by consulting Dr. Dickson to develop possible mitigation evidence, including about Bejarano's mental health. Trial counsel presented aspects of Bejarano's history in the foster care system and focused his strategy on eliciting mercy from the jurors. That strategy, however, failed, largely because of Bejarano's testimony. Thus, this was not a case where counsel relied solely on a mental assessment without further consideration. *Cf. Hendricks v. Calderon*, 70 F.3d 1032, 1044–45 (9th Cir. 1995). Other evidence supporting APD and Bejarano's violent threats while incarcerated could have provided potentially damning context about his background. *See Sanchez*, 994 F.3d at 1148.

Moreover, even if Dr. Etcoff's neuropsychological report had been available to trial counsel, trial counsel would not have been deficient for failing to present it. Dr. Etcoff concluded that, had Bejarano's background been different, he might not have become a killer. He also concluded that if his attorney did not tell him that his case was hopeless, Bejarano "might have been able to cooperate with his attorneys rather than impetuously getting up before the [j]udge and the jury and act in a self-destructive manner born out of enormous anger, sadness, and frustration." That said, Dr. Etcoff would likely have been cross-examined on how no prior psychologist or psychiatrist in Bejarano's childhood or adulthood had reached the same diagnostic conclusions. The prosecution also could have presented Dr. Etcoff's additional conclusion that Bejarano, when intoxicated, "can be and has been a truly dangerous individual capable of physical violence," and that by the time Bejarano was an adolescent, his "anger was no longer containable, especially

under the influence of alcohol."  *See Belmontes*, 558 U.S. at 24–25 (explaining that any expert testimony on the defendants' nonviolent adjustment would immediately open the door to rebuttal evidence).

ii

Trial counsel consulted expert psychologist Dr. Charles Dickson but decided not to call him either to present a mental-state defense or to provide mitigating testimony.  Dr. Dickson determined that Bejarano fully understood that going to trial could lead to a death sentence.[8]  Bejarano now argues that his trial counsel was deficient for failing to use Dr. Dickson's interview notes and reports as mitigation evidence because these reports placed him "on notice that his client may be mentally impaired."

Ultimately, Dr. Dickson's interactions with Bejarano could have proven deeply harmful to Bejarano if introduced.  Dr. Dickson wrote that Bejarano "can be violent."  Worse yet, Bejarano told Dr. Dickson that he "was going to kill" trial counsel.  Dr. Dickson, along with his colleague, Dr. Thornton, left those meetings considering Bejarano "the most amoral, horrible individual they [had] ever encountered in 25 years" of practice.  Trial counsel concluded that this "undercut everything [they were] trying to do with Dr. Di[cks]on."

---

[8] Dr. Dickson worked with the trial team to review Bejarano's options regarding accepting a guilty plea and receiving a life sentence or going to trial and receiving a possible death sentence.  Bejarano told Dr. Dickson that he wanted to speak to the prosecutor to confirm whether the prosecution would seek the death penalty should he be tried.  But the prosecutor declined to speak with Bejarano.  Dr. Dickson believed that Bejarano's disappointment from that denial may have led to his sudden decision to reject the plea.

As to Wright's killing, Dr. Dickson noted that Bejarano said he could remember being in the cab on the road and remembered checking a tote into the casino where he was found, and that the murder weapon might have been in the bag. Bejarano also told Dr. Dickson other places he thought he might have left the murder weapon.

Thus, counsel asked Dr. Dickson not to prepare a written report and did not call him to testify. Trial counsel knew that Dr. Dickson would have offered harmful testimony and made the informed, strategic decision not to call him.

*       *       *

As it relates to Bejarano's first trial IAC claim (which was decided on the merits), the Nevada Supreme Court's conclusion that trial counsel did not render deficient performance was reasonable. And, as it relates to Bejarano's second trial IAC claim (which was not decided on the merits), counsel's failure to introduce the additional mitigation evidence was either not deficient, not prejudicial, or both: even assuming that Bejarano's trial counsel at times performed deficiently, we conclude that the "cumulative effect" of any errors did not prejudice Bejarano. *Williams*, 908 F.3d at 570. Even "if the new mitigation evidence were to be added to the mix," no juror would have voted for life in prison instead of the death sentence. *Andrews*, 944 F.3d at 1108.

## C

Bejarano also argues that his counsel on direct appeal rendered ineffective assistance. He contends that on direct appeal his counsel had a conflict of interest, failed to challenge the trial court's removal of a potential juror, and failed to raise several other issues later raised in a federal

habeas petition.  Many of Bejarano's appellate IAC claims
are untimely under AEDPA's statute of limitations because
the State was not provided proper notice of these claims.  But
the remaining claims fail on the merits even if the State were
on notice of them.  Thus, we affirm the district court's denial
of Bejarano's appellate IAC claims.

1

We expanded the certificate of appealability to include
whether, considering "intervening law," "the District Court
err[ed] in ruling that a number of [Bejarano's] claims are
procedurally barred[.]"    Bejarano now argues in his
replacement briefs that the district court's timeliness
conclusions were incorrect.

As the State recognizes, however, the expanded
certificate of appealability did not encompass a timeliness
argument.  Because those arguments are beyond the scope of
the certificate of appealability and were not presented to the
district court, we interpret Bejarano's timeliness argument as
a motion to expand the certificate of appealability.  9th Cir.
R. 22-1(e); *see also Slack v. McDaniel*, 529 U.S. 473, 484
(2000).[9]  We grant that motion.

---

[9] Previously, we remanded to the district court to determine whether the
Supreme Court's opinion in *Martinez*, 566 U.S. 1, warranted
reconsideration of Bejarano's procedurally defaulted appellate IAC
claims.  The Supreme Court, in *Davila v. Davis*, 582 U.S. 521, 529–30
(2017), abrogated the procedural default holding in *Nguyen* and limited
*Martinez* to underlying claims of trial IAC.  Therefore, *Martinez*'s cause-
prejudice exception does not apply to the procedurally defaulted
appellate IAC claims.

a

We next consider the threshold question of whether AEDPA's one-year statute of limitations for submitting federal petitions filed after April 24, 1996, applies to Bejarano's appellate IAC claims. *See* § 2244(d)(1)(A). We conclude that it does.

The district court, in 1992, dismissed Bejarano's 1991 petition because it included unexhausted claims. It expressly denied Bejarano's motion for a stay and granted the State's motion for dismissal without prejudice. Bejarano argues that the district court's 1992 dismissal of his federal petition constituted "an administrative closure with leave to reopen" and was functionally equivalent to a stay. He also argues that, during the "relevant time period," Nevada federal courts treated administrative closures as de facto stay orders. Because he believes that the original 1998 petition was a continuation of the earlier 1991–92 action, Bejarano argues that AEDPA's statute of limitations should not apply.

Bejarano relies on *Dees v. Billy*, 394 F.3d 1290 (9th Cir. 2005). In *Dees*, the district court did not dismiss the case but stayed the action and compelled arbitration, which meant the action could not be appealed. *Id.* at 1293. The underlying claim remained pending before the district court. *Id.* at 1291 n.3, 1293. Unlike *Dees*, the district court's 1992 order here dismissed Bejarano's petition without prejudice, leaving no claims pending before the district court, and constituting a final appealable order. For similar reasons, *Thomas v. Chappell*, 678 F.3d 1086 (9th Cir. 2012), is inapt. There, we considered a petition filed before AEDPA's effective date and amended afterward. *Id.* at 1100. Bejarano's petition, unlike the one in *Thomas*, was dismissed without prejudice to exhaust claims in state court.

The district court also correctly concluded that Bejarano's 1991 petition was dismissed, not merely administratively closed.  In *Libberton v. Ryan*, 583 F.3d 1147, 1161–62 (9th Cir. 2009), we considered whether a petitioner's post-AEDPA petition related back to a pre-AEDPA petition because the district court had "never really dismissed" the earlier petition.  The district court's order dismissing the pre-AEDPA petition without prejudice in that action included a timeline for filing an "amended" petition after exhausting claims in state court.  *Id.* at 1159, 1161–62.  The petitioner there argued that the district court retained jurisdiction and, much like Bejarano argues, that the dismissal was the functional equivalent of a stay.  *Id.*  We rejected both arguments.  Although the order at issue in that case used the term "amended" to refer to an anticipated post-exhaustion petition, "the order was clearly titled a dismissal."  *Id*. at 1162.

Here, too, the district court's order describes itself as an "Order Dismissing Mixed Petition."  That order grants the pending motion to dismiss Bejarano's claims without prejudice and orders Bejarano to "prepare a *new* federal Habeas Corpus Petition."  The 1992 order denied Bejarano's motion to stay proceedings while he exhausted his claims in state court.  Unlike the order in *Libberton*, the Order contains no language (such as "amended") suggesting any continuity between the dismissed and future petition.  Thus, following *Libberton*, the district court's order is a "dismissal" and not an administrative stay of habeas proceedings.**[10]**

---

[10] Bejarano's arguments that federal district courts in Nevada—several years after Bejarano's 1991 petition was dismissed—appeared to have a practice of administratively closing unexhausted or mixed petitions is

The district court appropriately dismissed Bejarano's pre-AEDPA petition without prejudice because it contained unexhausted claims. *Accord Coleman v. Thompson*, 501 U.S. 722, 731 (1991). As a result, Bejarano's subsequent, post-AEDPA petition, is subject to AEDPA's strictures.**[11]**

b

We next consider the timeliness and, where appropriate, merits of Bejarano's appellate IAC claims. The district court correctly determined that some but not all the appellate IAC claims relate back to factual assertions in his 1998 original petition under *Nguyen*'s broad relation-back standard. *Bejarano V*, 2015 WL 4038790, at *2.

We review de novo the district court's application of the relation-back doctrine. *Schneider v. McDaniel*, 674 F.3d 1144, 1148–49 (9th Cir. 2012) (citing *Williams v. Boeing Co.*, 517 F.3d 1120, 1132 (9th Cir. 2008)). An otherwise untimely amended pleading "relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).

We follow a two-step process to determine whether an amended petition relates back to an original petition. *Ross*

---

irrelevant to our determination that the 1992 order dismissed the proceedings. The cases cited by Bejarano show that, when courts intend to administratively close petitions (rather than dismissing them without prejudice), they know how to do so expressly.

[11] This conclusion accords with that of our sister circuits. *See Warren v. Gavin*, 219 F.3d 111, 112–14 (2d Cir. 2000); *Graham v. Johnson*, 168 F.3d 762, 780 (5th Cir. 1999); *Roldan v. United States*, 96 F.3d 1013, 1014 (7th Cir. 1996); *see also In re Vial*, 115 F.3d 1192, 1198 n.13 (4th Cir. 1997) (en banc) (collecting cases).

*v. Williams*, 950 F.3d 1160, 1167 (9th Cir. 2020).  First, we determine which claims are alleged in the amended petition "and what core facts underlie those claims."  *Id.*  Second, we look at the body of the original petition and exhibits to see whether they attempted to or did set forth a corresponding factual basis.  *Id.*  The claims in the amended petition relate back if they expand on, correct, or modify the facts set forth in the original petition.  *Id*. at 1167–68.

We must determine whether the claim in the 1998 original petition and the claim in the SAP "share a common core of operative facts."  *Ross*, 950 F.3d at 1168; *Mayle v. Felix*, 545 U.S. 644, 664 (2005); *see also Nguyen*, 736 F.3d at 1296–97.  It is enough if the original petition attempts to set forth the factual basis, which may include incorporating facts from an attachment by reference.  *Ross*, 950 F.3d at 1168.  If, however, facts in an attachment are unrelated to the grounds for relief in the petition itself, merely attaching the document cannot constitute an attempt to set forth those facts.  *Id.* at 1168–69.

We thus first assess which claims properly relate back to the timely filed petition.  And for claims that do relate back, we proceed to the merits, applying the two-pronged *Strickland* standard.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).  And, as noted above, this analysis is subject to AEDPA's deferential review.  *See* § 2254(d).

i

First, we consider appellate IAC claim (a), that alleges that direct appellate counsel had a conflict of interest.  The district court concluded that this claim did not relate back to the timely filed petition.  *Bejarano V*, 2015 WL 4038790, at *2.  Bejarano argued before the district court that his 1998 petition stated that the Washoe County Public Defender's

Office "got [his] case back on appeal despite the fact that there was an original conflict of interest." But Bejarano's 1998 petition contains no such language. Rather, that assertion is found only in Bejarano's memorandum of points and authorities in support of his 1992 state petition. This was not alleged in Bejarano's 1998 petition. Such language also does not appear in Bejarano's 2003 amended § 2254 petition.

Thus, Bejarano's relation back argument fails. There were no factual allegations of an appellate counsel conflict of interest in the 1998 petition or express attempt to incorporate such allegations by reference in that petition. *Id.* Bejarano's 1998 petition does not provide a common core of operative facts allowing appellate IAC claim (a) to relate back and is therefore untimely. *See Ross*, 950 F.3d at 1168. And even taking the 1992 reference to a conflict of interest at face value, it suggests only an "original conflict of interest" but does not allege an ongoing conflict for appellate counsel that would interfere with her representation of Bejarano.

ii

Next, we consider appellate IAC claim (b), which relates to the failure to challenge the for-cause removal of juror Daniel Mahe. The district court concluded that this claim related back and was therefore timely. And because the Nevada Supreme Court considered this claim, the district court considered this claim on the merits. *Bejarano V*, 2015 WL 4038790, at *2–3. The district court concluded that the Nevada Supreme Court's decision was objectively reasonable and based on a reasonable determination of the facts. *Id.* We agree that this claim relates back. We also

agree that this claim fails on the merits, and thus that the Nevada Supreme Court reasonably denied the claim.

The claim turns on Bejarano's argument that appellate counsel rendered ineffective assistance by failing to challenge the excusal of Mahe for cause based on his views on the death penalty. The prosecutor, defense counsel, and trial court all questioned Mahe extensively during voir dire regarding his views on the death penalty. *Id.* at \*3.

Mahe had raised his hand and expressed uncertainty about whether he could vote for the death penalty. Mahe stated that he would be unable to return a verdict of death. After further questioning, Mahe said that terminating someone's life would affect his conscience. The prosecutor asked clarifying questions to establish that Mahe would not struggle with a guilty verdict but would not consider a death verdict even if the other jurors voted in favor. Mahe told counsel and the court, "I am probably not the right one, that's all I can tell you." After further questions and hypotheticals from Bejarano's counsel, Mahe concluded, "I don't think I should be here. Tough decision for me." It was only then that the trial court excused him.

The Supreme Court has held that a juror may be stricken for cause if his views on the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (citations omitted). Such bias need not be proven with "unmistakable clarity" and there will be "situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 424–26. Accordingly, we give deference to the trial court's determination of bias based in part on the demeanor

of the potential juror. *See Uttecht v. Brown*, 551 U.S. 1, 9 (2007).

Bejarano raises a conclusory argument that Mahe's "views would not have prevented or substantially impaired the performance of his duties as a juror." But the state court's denial of this appellate IAC claim was reasonable. *See Richter*, 562 U.S. at 104–05. Mahe repeatedly and clearly stated that his views would substantially impair his ability to fulfill his duties as a juror. Mahe expressed bias reasonably creating the impression that his ability to faithfully and impartially apply the law was impaired.

Accordingly, any decision not to raise this claim on appeal was a reasonable tactical decision by appellate counsel. And, in any case, as discussed above, there was no reasonable probability of a different outcome had appellate counsel raised this claim. *See Smith*, 528 U.S. at 285.

iii

Next, we consider Bejarano's appellate IAC claim (c). Bejarano challenges appellate counsel's decision not to raise the four following additional issues on direct appeal:

> (1) "a Confrontation Clause violation due to the admission of the testimony of Joseph Morton at Petitioner's preliminary hearing";
>
> (2) "a violation of the trial court's order precluding the admission of Robert Kindell's penalty hearing testimony on a murder for hire offense";
>
> (3) "the submission of invalid aggravating circumstances to the jury"; and

(4) "the prejudice that resulted from an ex parte hearing that occurred after the guilt phase of the trial wherein the trial court questioned Petitioner about trial counsel's effectiveness."

*Bejarano V*, 2015 WL 4038790, at *4. The district court determined that the core operative facts for the first two sub-claims did not relate back, but that the latter two sub-claims did. *Id.* We agree.

(a)

Neither sub-claim (1) nor (2) regarding the admission of various testimony, relates back to the first timely petition.[12] Bejarano argues that these claims relate back to his original 1998 petition, in which he asserted that direct appellate counsel "provided ineffective assistance of counsel for not raising the many other remaining issues." But the 1998 petition did not identify either of the sub-claims Bejarano now raises.

For instance, regarding sub-claim (1), dealing with Morton, Bejarano alleged prosecutorial misconduct in the examination and impeachment of Morton at the preliminary hearing to induce him to refuse to testify at trial. But nothing in the 1998 petition alleges Bejarano's own counsel erred regarding Morton. This sub-claim does not relate back and is therefore untimely.

Even if it were timely, sub-claim (1) lacks merit. Appellate counsel's memorandum showed that she considered challenging the admission of Morton's

---

[12] We grant Bejarano's 2016 unopposed motion requesting judicial notice of state trial court records of an affidavit related to Joseph Morton.

preliminary hearing testimony. Bejarano's postconviction counsel did not ask her, however, about this claim or whether she omitted it based on an ongoing conflict of evidence or for some other reason. Thus, Bejarano's claim rests on an absence of evidence, which cannot overcome *Strickland*'s presumption of competency. *See Dunn*, 594 U.S. at 733–34.

For similar reasons, sub-claim (2), relating to Kindall's penalty phase testimony, fails. Bejarano's 1998 petition does not refer to or identify any attachment incorporating Kindell's penalty phase testimony. Given the lack of any "common core" of facts, neither of these sub-claims relates back to Bejarano's initial petition. *See Nguyen*, 736 F.3d at 1297. Thus, both sub-claims are untimely.

### (b)

Bejarano's next appellate IAC sub-claim deals with appellate counsel's failure to challenge the aggravating circumstances presented at the penalty phase.

Bejarano first argues that appellate counsel rendered ineffective assistance by failing to challenge two aggravating factors that the Nevada Supreme Court later invalidated: robbery felony and receiving money, Nev. Rev. Stat. § 200.033(4), (6) (1985). In *McConnell v. State*, 102 P.3d 606 (Nev. 2004) (per curiam), the Nevada Supreme Court concluded that when a murder charge was based on felony murder, it was impermissible to base death eligibility on aggravating factors (such as these) that turned on the predicate felony. *Id.* at 620–27.

But a failure to challenge these aggravating factors was not inherently erroneous or unreasonable. As the Nevada Supreme Court recognized 18 years later, these aggravating factors were, after all, valid under state law when Bejarano's

appeal was pending in 1988, and counsel lacked viable, non-speculative legal grounds on which to stake a challenge before *McConnell* was decided. *See Bailey v. Newland*, 263 F.3d 1022, 1028–29 (9th Cir. 2001). A failure to predict substantive developments in Nevada law is not deficient performance.

Additionally, the Nevada Supreme Court later invalidated these aggravating factors while affirming Bejarano's conviction upon a reweighing analysis. This demonstrates that any failure to challenge these aggravating factors was not prejudicial as Bejarano would not have reasonably obtained a different outcome.

Next, Bejarano argues that appellate counsel should have challenged two other aggravating factors on appeal, that: (1) the murder was committed to avoid or prevent a lawful arrest, and (2) the murder was committed under sentence of imprisonment, Nev. Rev. Stat. § 200.033(1), (5) (1985). The Nevada Supreme Court determined on direct appeal that both aggravating factors were valid and supported by sufficient evidence.

Bejarano's initial petition challenges reliance on these aggravating factors. *Bejarano V*, 2015 WL 4038790, at *4. Thus, even though Bejarano did not specifically identify how the appellate IAC claim related back, the "common core" of facts between these claims satisfies *Nguyen*. *See* 736 F.3d at 1296–97.

The district court concluded that the second aggravating factor, murder committed under sentence of imprisonment, did not relate back. *Bejarano V*, 2015 WL 4038790, at *4 n.4. We disagree. Although Bejarano did not assert that the IAC claim related back to claims in his timely 1998 original petition, he identified the relevant pages in the 1992 state

petition, attached as an exhibit. Bejarano also argued in the 1998 original petition that he was on parole for a prior charge in Idaho and that, therefore, he was not under a "sentence of imprisonment."

We therefore review this sub-claim on the merits because it properly relates back, and the arguments were considered by the Nevada Supreme Court. We conclude that the Nevada Supreme Court reasonably denied this claim.[13]

We begin by considering the first aggravating factor, which relates to murders committed to avoid or prevent lawful arrest. That factor properly applied to Bejarano's case because the murder was not necessary to carry out the robbery and only eliminated the sole eyewitness to the crime. Thus, appellate counsel did not render ineffective assistance for failing to challenge this factor. Still, Bejarano argues that the application of that factor violated his federal constitutional rights under *Williams*, 908 F.3d at 546, and was essentially arbitrary. We disagree.

In *Williams*, we considered an Eighth Amendment challenge to Nevada Revised Statute § 200.033(5) (1981) alleging that the Nevada Supreme Court applied the factor "whenever a defendant murders the victim to prevent her from serving as a witness" against the defendant. *Id.* at 575.

---

[13] Bejarano now argues, for the first time, that his appellate IAC claims were not addressed on the merits by the Nevada Supreme Court. He therefore abandoned this argument. It also lacks merit; the Nevada Supreme Court denied the appellate IAC claims on the merits, independently of that court's ruling on Bejarano's other contentions. Because its merits discussion and analysis were independent of other considerations, the Nevada Supreme Court sufficiently double-barreled its decision. *See Apelt v. Ryan*, 878 F.3d 800, 825 (9th Cir. 2017). Thus, Bejarano fails to overcome *Richter*'s presumption that the state court adjudicated this claim on the merits. *See* 562 U.S. at 99–100.

There, the defense argued this factor applied to every murder case because every murder victim could serve as a witness. *Id.* We agreed that, if read this broadly, the factor would be constitutionally defective because it would fail to "genuinely narrow the class of persons eligible for the death penalty." *Id.* (quoting *Romano v. Oklahoma*, 512 U.S. 1, 7 (1994)).

But, in *Williams*, we concluded that the application of this factor was permissible because the Nevada Supreme Court upheld reliance on this factor "only when the State has proved that the defendant committed murder for the purpose of preventing the victim from serving as a witness to *some antecedent crime* (*separate from* the murder)." *Id.* at 576 (emphasis added). Multiple Nevada Supreme Court decisions likewise permit relying on this factor in similarly narrow circumstances. *See id.* (first citing *Jeremias v. State*, 412 P.3d 43, 55 (Nev. 2018) (en banc), and then citing *Domingues v. State*, 917 P.2d 1364, 1376–78 (Nev. 1996)).

Bejarano's attempts to distinguish *Williams*, *Jeremias*, and *Domingues* are unavailing. He asserts those cases were different because the aggravating factor was based on circumstances where the victims either actively tried to prevent flight from a felony, or where they knew the perpetrator. This distinction misses the mark. Trying to stop a defendant from flight or prior knowledge of the defendant's identity was never essential to satisfying this factor. *See Jeremias,* 412 P.3d at 52; *Domingues*, 917 P.2d at 1376–77.**[14]**

---

[14] Bejarano also asserts that the state court has not applied the aggravating factor in similar cases and that it was thus arbitrarily applied to him. *See Robinson v. Schriro*, 595 F.3d 1086, 1107–08 (9th Cir.

There is also no reasonable probability that the outcome of Bejarano's direct appeal would have been different had appellate counsel challenged reliance on this aggravating factor. *See Arave v. Creech*, 507 U.S. 463, 478 (1993); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The Nevada Supreme Court independently reviewed all six aggravating factors and determined that this factor was appropriately applied to Bejarano. In other words, the Nevada Supreme Court ultimately considered this issue, and raising the issue would not have brought a different outcome. *See Smith*, 528 U.S. at 285–86. The Nevada Supreme Court's rejection of his appellate IAC claim was reasonable under AEDPA and *Strickland*'s double deference. *See Richter*, 562 U.S. at 104–05.

Bejarano's claim about § 200.033(1)'s under-sentence-of-imprisonment aggravating factor also fails. Bejarano admits that he was under a sentence of probation for a misdemeanor battery charge. And the Nevada Supreme Court determined that this factor applied to those on probation or parole, at least in cases of felony offenses. *Parker v. State*, 849 P.2d 1062, 1068 (Nev. 1993). Other Nevada Supreme Court cases demand even less by not limiting the factor's application to felony-offense probation. *See, e.g.*, *Grant v. State*, 659 P.2d 878, 878–79 (Nev. 1983) (per curiam).

Thus, the state court reasonably concluded that Bejarano's appellate counsel did not render deficient performance for failing to raise a weak challenge. *See*

---

2010). But the state court has, in fact, explained how this aggravating factor may apply in similar cases. *See Jeremias*, 415 P.3d at 52; *Domingues*, 917 P.2d at 1376–77.

*Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir. 1997).[15]  In any case, the Nevada Supreme Court ultimately considered this issue, and raising the issue on direct appeal would not have brought a different outcome.  *See Smith*, 528 U.S. at 285–86.   Accordingly, the Nevada Supreme Court's decision, entitled to double deference, is not unreasonable.

### (c)

Finally, we address Bejarano's sub-claim that appellate counsel was deficient in failing to challenge a post-sentencing ex parte hearing in which the trial court questioned Bejarano about trial counsel's effectiveness. Bejarano's initial 1992 petition contained a claim based on that ex parte hearing. *Bejarano V*, 2015 WL 4038790, at *4, *6. And the Nevada Supreme Court denied that claim as part of Bejarano's blanket appellate IAC claim in his Second PCR.

Bejarano points to *United States v. Del Muro*, 87 F.3d 1078 (9th Cir. 1996) (per curiam), a pre-AEDPA direct appeal from a federal conviction.  In *Del Muro*, the trial court held an evidentiary hearing on the defendant's motion for a new trial based on alleged ineffective assistance of counsel. *Id*. at 1080.  It then denied a motion for substitute counsel to conduct the hearing and required trial counsel to lead the hearing, including the examination of witnesses to his own

---

[15] Bejarano also argues that Nevada should not have read his probationary term from Idaho as "a sentence of imprisonment" because Idaho would not interpret it as such.  But Bejarano did not present this argument to the district court. *Bejarano V*, 2015 WL 4038790, at *4–5. And even if he did, Bejarano failed to show that the Nevada Supreme Court's interpretation of Nevada law was so objectively unreasonable as to justify disturbing his conviction. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam).

alleged incompetence.  *Id.*  Based on those facts, we determined that counsel's interests were "diametrically opposed" to those of the defendant because counsel had a strong disincentive to engage in vigorous argument or examination or to be candid with his client.  *Id.*

But the ex parte hearing here did not resemble the hearing in *Del Muro*.  Bejarano did not accuse trial counsel of incompetent representation and disputed only one tactical decision.  *See Stenson v. Lampert*, 504 F.3d 873, 888–89 (9th Cir. 2007).  And the hearing was ordered by the court as part of its routine practice in serious criminal matters.  With Bejarano present, the court explored his trial counsel's efforts to prepare for the penalty hearing.  The hearing was not contentious.

In fact, Bejarano stated that trial counsel had "done the impossible" in putting on a defense.  Bejarano and his counsel apparently disagreed over whether to call Probation Officer Franks as a sentencing phase witness.  But, as discussed above, counsel's decision was reasonable and tactical, and Bejarano eventually came to agree with it.  Any purported conflict during the ex parte hearing is purely speculative.  And because the mere "possibility of conflict is insufficient to impugn a criminal conviction," *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980), this sub-claim fails.

Bejarano also made no specific arguments before the district court or this court regarding why appellate counsel rendered ineffective assistance in failing to raise a claim challenging the ex parte hearing on direct appeal.  Appellate counsel considered this claim but chose not to raise it, indicating that she made a tactical decision.  In addition, any lack of memory by appellate counsel on that point in her deposition is not proof of deficient performance.  *See Dunn*,

594 U.S. at 733–34.    Thus, the state court did not
unreasonably deny Bejarano's IAC claim.  *See Richter*, 562
U.S. at 104–05.

*       *       *

In conclusion, we expand the certificate of appealability
to encompass the district court's timeliness determinations
on Bejarano's appellate IAC claims.  We deny some claims
because they do not relate back to the original petition.  We
reject the others on the merits, concluding that the Nevada
Supreme Court's rejection of the appellate IAC claims was
not unreasonable.

D

As the fourth and final certified issue, Bejarano argues
that the Nevada Supreme Court failed to provide adequately
close appellate scrutiny of his sentence.  Because the court's
review was not contrary to or an unreasonable application of
clearly established Supreme Court precedent, and was not
based on an unreasonable determination of the facts, we
affirm the district court's denial of this claim.    *See*
§ 2254(d)(1), (2).

1

First, Bejarano argues that the Nevada Supreme Court
improperly conflated reweighing analysis with harmless
error analysis after it struck two invalid aggravating factors
in reviewing his Third PCR.

Based on *McConnell*, the Nevada Supreme Court struck
two of the aggravating factors at sentencing—robbery and
receiving money.    102 P.3d 606; *see* Nev. Rev. Stat.
§ 200.033(4), (6) (2005); *Bejarano III*, 146 P.3d at 275–77.
The Nevada Supreme Court considered the remaining four

aggravating factors and determined that any error was harmless. 146 P.3d at 275–77. It concluded that the senselessness of Wright's murder, coupled with Bejarano's criminal history, lack of remorse, and threats to kill again, made it "clear beyond a reasonable doubt that absent the invalid aggravators the jury would have still sentenced Bejarano to death." *Id.* at 277. This was a reasonable application of clearly established Supreme Court precedent. *See Clemons v. Mississippi*, 494 U.S. 738, 753 (1990).

When a state appellate court strikes invalid aggravating factors, the court may conduct either a reweighing or a harmless error analysis. *Id.* at 750–52. If it chooses to conduct harmless error review, the state appellate court must balance the remaining valid aggravating factors against those presented in mitigation and determine whether the error was harmless beyond a reasonable doubt. *Id.* at 753–54. The Supreme Court declined to demand a "formulaic indication by state courts before their review for harmless federal error will pass federal scrutiny[.]" *Sochor v. Florida*, 504 U.S. 527, 540 (1992). But "a plain statement that the judgment survives on such an enquiry is clearly preferable to allusions by citation." *Id.*

If a court conducts a reweighing analysis, it must provide "close appellate scrutiny of the import and effect of invalid aggravating factors to implement the well-established Eighth Amendment requirement of individualized sentencing determinations in death penalty cases." *Stringer v. Black*, 503 U.S. 222, 230 (1992). That said, there is no specific "degree of clarity" that a reviewing court must employ in its reweighing analysis to support a death sentence. *Richmond v. Lewis*, 506 U.S. 40, 48 (1992). But the state court must actually reweigh the factors. *Id.* at 48–49. This, in turn, requires the state appellate court to

disregard invalid aggravating circumstances and conduct a "careful appellate weighing of aggravating against mitigating circumstances." *Clemons*, 494 U.S. at 748.

On the other hand, a harmless error analysis requires an appellate court to find "beyond a reasonable doubt that the same result would have been obtained without relying on the unconstitutional aggravating circumstance." *Valerio*, 306 F.3d at 756. This "appellate reweighing is akin to harmless error review," rather than an independent sentencing proceeding, where the reweighing occurs in a collateral proceeding under state law. *McKinney v. Arizona*, 589 U.S. 139, 146 (2020).

Bejarano argues that the Nevada Supreme Court used the terms "reweighing" and "harmless error" interchangeably and that the two analyses were treated "essentially the same." *See State v. Haberstroh*, 69 P.3d 676, 682–84 (Nev. 2003) (en banc) (applying both analyses). Bejarano contends that this resulted in impermissible ambiguity, resulting in inadequate appellate scrutiny under *Sochor*. 504 U.S. at 540.

But the Nevada Supreme Court's opinion in *Bejarano III* is far removed from the state supreme court opinion at issue in *Sochor*. The opinion in *Sochor* failed to even use the phrase "harmless error" and instead focused on the proportionality of the imposed sentence (an altogether different constitutional concern). *Id.* at 539–40. Thus, the error in *Sochor* was not that the state supreme court was insufficiently precise in demarcating the boundary between reweighing and harmless error—it was not at all clear that the court there engaged in *either* analysis. *Id.*

No similar problem exists here. The Nevada Supreme Court, in denying Bejarano's Third PCR, conducted a

harmless error analysis, concluding that "any effect these two aggravators had on the jury's decision to impose a death sentence was harmless beyond a reasonable doubt." *Bejarano III*, 146 P.3d at 268. The court then conducted a "[r]eweighing [analysis] . . . to answer the following question: Is it clear beyond a reasonable doubt that absent the invalid aggravators the jury still would have imposed a sentence of death?" *Id.* at 276. The court answered "yes," so any "errors were harmless." *Id.*

The Nevada Supreme Court then described the four remaining valid aggravating factors and the mitigation evidence presented to the jury. *Id.* at 276–77. The court noted that the two invalid aggravators were based on the same circumstance, so removing them "effectively eliminates the weight of one aggravating circumstance." *Id.* at 276. The court then concluded that "the case in mitigation was not particularly compelling." *Id.* Testimony about Bejarano's threats to kill again and propensity for violence, combined with his own damaging testimony, made the remaining aggravating circumstances particularly strong. *Id.* at 276–77. Thus, "[r]eweighing [the remaining aggravating factors] against the mitigating evidence," the Nevada Supreme Court concluded "beyond a reasonable doubt that absent the invalid aggravators the jurors would have still found Bejarano death eligible." *Id.* at 276.

We reiterate that there is no constitutional requirement for a "particular formulaic indication" when conducting the reweighing or harmless-error analyses. *Sochor*, 504 U.S. at 540. And, under Nevada law, the court could permissibly conduct either a reweighing or a harmless error analysis. *Leslie v. Warden*, 59 P.3d 440, 446–47 (2002) (en banc). It did so. Therefore, the court's determination passed constitutional muster regardless of whether it conducted

only a harmless error analysis or whether it conducted reweighing and harmless error analyses (or whether it used inconsistent terminology). *Bejarano IV*, 2010 WL 3522374, at \*5; *Sochor*, 504 U.S. at 539–40. And, at bottom, its analysis was a reasonable application of *Chapman v. California*, 386 U.S. 18 (1967).[16]

2

Relatedly, Bejarano argues that the Nevada Supreme Court violated his constitutional rights by disregarding additional mitigation evidence that he tried to present with his Third PCR. He argues that this evidence needed to be considered as the Nevada Supreme Court conducted a harmless error or reweighing analysis. But no clearly established Supreme Court precedent supports his argument. *See* § 2254(d)(1).

Bejarano mainly relies on *Terry Williams*. The cited portion of *Terry Williams*, however, discussed prejudice in the context of an IAC mitigation claim and determined—at least for that issue—that a state court would need to consider evidence "adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." 529 U.S. at 397–98 (citing *Clemons*, 494 U.S. at 751–52).

*Terry Williams*, as well as *Clemons*, on which *Terry Williams* relies, are silent on whether an appellate court must

---

[16] Because Bejarano fails to show that the Nevada Supreme Court's *Chapman* analysis was unreasonable, we need not consider whether consideration of the invalid aggravators was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Davenport*, 596 U.S. at 122 ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA.").

consider additional mitigating evidence as part of a reweighing or harmless error analysis when considering the potential effect of invalid aggravators. *See Clemons*, 494 U.S. at 751–52. Instead, *Clemons* held that a state supreme court erred by determining that a death penalty verdict would remain in place when there remained at least one valid factor supporting the verdict, *absent* reweighing *or* harmless error analysis. *Id.* Further, the Supreme Court did not discuss any new evidence that had not been presented to the jury. The Supreme Court also noted that the state supreme court had only mentioned, but not applied, a detailed description of a harmless error test and again referenced the evidence presented to the jury and not other evidence later developed. *Id.* at 753–54.

Bejarano also cites *Jeffers v. Lewis*, 38 F.3d 411 (9th Cir. 1994) (en banc), for the proposition that the Nevada Supreme Court should have made an individualized sentencing determination. In *Jeffers*, however, the post-trial hearings were actual sentencing hearings, not evidence submitted later in otherwise procedurally defaulted state postconviction petitions. *Id.* at 413–14. More to the point, *Jeffers* did not announce a constitutional rule requiring a state supreme court engaged in a reweighing or harmless error analysis, upon invalidation of an aggravating circumstance, to consider new evidence not before the sentencer. Bejarano's proposed rule thus finds no support in clearly established Supreme Court precedent.

It also departs from our en banc decision in *Valerio*. There, we noted that a harmless error analysis under *Chapman* would allow the state court to affirm "if it finds beyond a reasonable doubt that the same result would have been obtained without relying on the unconstitutional aggravating circumstance." *Valerio*, 306 F.3d at 756 (citing

*Clemons*, 494 U.S. at 752–53).   Thus, a harmless error analysis is necessarily backward-looking: courts consider the actual sentence compared to the sentence that would have been imposed absent the invalid aggravator.   And courts do not reference other evidence not presented.  *See id.* at 756–58.

*Valerio* also reaffirms that the "appellate court does no independent factfinding, but rather relies on facts already found by the jury.   That is, under *Clemons*, the appellate court evaluates and 'reweighs' the aggravating and mitigating circumstances, but it does not independently determine whether those circumstances exist."  *Id.* at 757. For these reasons, the Nevada Supreme Court reasonably did not consider the new evidence submitted with Bejarano's Third PCR.  *See* § 2254(d)(1).

3

Bejarano next argues that the Nevada Supreme Court violated his right to equal protection by ignoring mitigating evidence from post-conviction evidentiary proceedings.  But Bejarano relies on cases that do not support his claim that he wasn't treated like similarly situated persons.[17]    *See Haberstroh*, 69 P.3d at 684 (noting that the petitioner would offer evidence in a subsequent penalty hearing but not explicitly factoring such evidence into its harmless error analysis); *State v. Bennett*, 81 P.3d 1, 11–12 (Nev. 2003) (en banc) (considering withheld *Brady* evidence in reweighing and harmless error analysis); *see also Williams*, 908 F.3d at 562 n.2.  At most, Bejarano has shown that the Nevada Supreme Court exercised discretion in determining

---

[17] Bejarano does not even suggest, for example, that he belongs to a suspect class.  *Cf. Vacco v. Quill*, 521 U.S. 793, 799 (1997).

reweighing and harmless error analyses when they are tied to other, valid claims that require consideration of other evidence outside the trial record. But the Equal Protection Clause is not an end run around AEDPA's highly deferential standard of review: at bottom, the Nevada Supreme Court's reweighing or harmless error analysis was a reasonable application of Supreme Court precedent. Accordingly, it survives our deferential AEDPA review. *See* § 2254(d).[18]

\* \* \*

After determining that two aggravating circumstances were invalid, the Nevada Supreme Court's analysis did not contradict or unreasonably apply clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. *See* § 2254(d)(1), (2). We therefore affirm the district court's denial of this habeas claim.

IV

Bejarano also presents three uncertified claims, that: (a) two additional aggravating factors were invalid; (b) a penalty-phase instruction erroneously instructed the jury how to consider non-statutory aggravating evidence; and (c) the prosecution withheld evidence about benefits provided to witness Kindell. The district court found that these claims were procedurally defaulted, deficient on the

---

[18] Finally, Bejarano argues that the Nevada Supreme Court should have considered the cumulative effect of penalty phase errors, which he suggests would have required consideration of other evidence first offered in the post-conviction proceedings. Bejarano has shown no error—let alone multiple errors—that could be aggregated. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").

merits, or untimely. We agree and decline to grant the certificate of appealability on these claims.

## A

Bejarano's first uncertified claim challenges the validity of two additional aggravating factors: under sentence of imprisonment and preventing lawful arrest. Nev. Rev. Stat. § 200.033(1), (5) (1985). The Nevada Supreme Court determined in 2006 that Bejarano's Third PCR, through which he first raised this claim, was untimely under Nevada law. *Bejarano III*, 146 P.3d at 269–70, 270 n.11. The district court dismissed this claim as procedurally defaulted because the Nevada Supreme Court's dismissal of the petition rested independently on state procedural grounds. Bejarano argues that this was error: first, because Nevada's timeliness procedural rule is not independent of federal law or an adequate bar to federal review, and second, because he had properly exhausted this claim in his direct appeal.

But Bejarano did not challenge the independence of the timeliness bar before the district court. He therefore waived any argument that the Nevada Supreme Court considered federal law in applying that bar. *See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998). Even if the Nevada Supreme Court elected, in some cases, to exercise its discretion to consider the merits of an otherwise time-barred claim, that does not necessarily render the time bar inconsistently applied or inadequate. *See Walker v. Martin*, 562 U.S. 307, 320 (2011); *see also Moran v. McDaniel*, 80 F.3d 1261, 1270 (9th Cir. 1996).[19] We

---

[19] Bejarano also argues that this claim was exhausted. Even if Bejarano is correct, this claim lacks merit for the same reasons as Bejarano's appellate IAC claims. *See supra* 50–54.

therefore deny the request to expand the certificate of appealability on this claim.  *See Miller-El*, 537 U.S. at 327, 348.

B

In his second uncertified claim, Bejarano argues that a jury instruction was erroneous because it improperly suggested that jurors could consider all trial evidence in the death eligibility determination.  This allegedly violated Nevada law and thwarted the narrowing function of Nevada's death penalty scheme.

The instruction stated:

> In determining which of the several available sentences is appropriate, you are entitled to consider all evidence presented during the trial as well as such evidence as may have been presented in the penalty hearing.  The evidence in this case consists of the sworn testimony of the witnesses and all exhibits which have been received in evidence.

The trial court gave two further instructions, stating Bejarano was death-eligible only if (1) the jury found one or more statutory aggravating circumstances beyond a reasonable doubt, and (2) determined that any mitigating circumstances did not outweigh the aggravating circumstances.  The jurors were also instructed that the "only circumstances by which murder of the first degree may be aggravated are" the enumerated statutory aggravating circumstances.  Then, the jurors were told that mitigating circumstances included "[a]ny other mitigating circumstance."

In context, the jury was fairly instructed that they could consider Bejarano death-eligible only if they found evidence supporting a statutory aggravating circumstance beyond a reasonable doubt and determined that the mitigating evidence did not out outweigh the aggravating circumstances.    Jurors are presumed to understand and follow jury instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).   Bejarano offers nothing but speculation to rebut this presumption. *See id.* at 234.

There is no reasonable likelihood that the jury applied the instruction in violation of the Constitution. *See Boyde v. California*, 494 U.S. 370, 380 (1990).  Even if the instruction were erroneous, it did not "so infect[] the entire trial that the resulting conviction violate[d] due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  Thus, we deny the certificate of appealability.**[20]**   *See* § 2253(c)(2); *Slack*, 529 U.S. at 484–85.

C

Bejarano's final uncertified claim alleges that the State withheld evidence of benefits it provided to witness Kindell in exchange for his testimony and failed to correct his false testimony that he received no benefits.  In 2008, the district court determined that this claim was barred by AEDPA's statute of limitations.

---

[20] Bejarano also claims appellate counsel rendered ineffective assistance in failing to challenge "the 'other matter' jury instruction."   Although Bejarano's brief cross-references a later section of his papers, that section does not mention the "other matter" instruction or develop this argument to explain how or why this failure was deficient or prejudicial. Thus, Bejarano's failure to adequately make this argument renders it waived. *See United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005).

Bejarano argues that this was error because he supposedly exercised sufficient due diligence to uncover evidence of Kindell's benefits.  As the district court found, however, any allegations about Kindell were publicly available.  Citing multiple court proceedings addressing Kindell's alleged stipulated sentence reduction, Bejarano argued in the state court that Kindell received multiple benefits in exchange for his testimony.  And trial counsel cross-examined Kindell at trial about a release violation, his failure to obtain employment, and probation violations stemming from two felony drug convictions.  As the district court concluded, this information was available to Bejarano when he filed his original § 2254 petition in 1998.

Ultimately, no reasonable jurist would disagree that Bejarano's third uncertified claim is untimely.  So we deny the certificate of appealability on this claim.  *See* § 2253(c)(2); *Slack*, 529 U.S. at 484–85.

V

John Bejarano shot and killed Roland Wright, a random cab driver, on a spring night in 1987.  He was tried and convicted by a jury of his peers in 1988.  After Bejarano testified in the penalty phase that the jurors better "pray to God I don't get out," and that there were other crimes for which he could be executed "five times," the jury sentenced him to death.  After decades of litigation, we affirm the district court's denial of his habeas petition on all grounds.

**AFFIRMED.**

Wardlaw, J., concurring:

I concur in the majority opinion except as to the assumed deficiency of trial counsel for failing to present favorable character witness testimony, described in Part III.B.3.b.iv. The presentation of mitigation evidence during the penalty phase is indispensable, particularly in capital cases. *Avena v. Chappell*, 932 F.3d 1237, 1251 (9th Cir. 2015). However, Bejarano's trial counsel failed to present readily available, and helpful, mitigation evidence. As the majority acknowledges, trial counsel could have easily presented favorable character evidence in the form of the testimony of Virginia Greathouse and Benjamin Wenke and his family. Trial counsel himself recognized the beneficial nature of this potential testimony. But instead of calling these witnesses in support of Bejarano, he admits that he gave up on saving his client from the death penalty, essentially abdicating his duty of zealously advocating for his client. In my opinion, this is deficient performance.

## I.

### A.

After Bejarano rejected a plea deal for first degree murder, trial counsel "was convinced the ultimate decision would be a verdict of guilty." He thought "the most [he] could do for this defendant was to attempt to avoid the imposition of the death penalty." He chose to forego both his opening statement and closing argument to the jury during the guilt phase to preserve his credibility for the penalty phase argument, because his "prime objective in this case" was to avoid a death sentence.

Despite his avowed objective of avoiding the death penalty, trial counsel presented minimal mitigating evidence

during the penalty phase. He presented 30 pages of welfare records from a youth spent in foster homes, Bejarano's GED, and his honorable discharge from the Marines based on mistaken enrollment. The defense strategy was, from the beginning, to engender sympathy for Bejarano, but trial counsel felt he hit a wall, lamenting that: "I needed somebody to say something good about him and nobody else that I had run into could . . . the only thing you could say good about John Bejarano that I was able to find out is that he walks, talks and breathes. Everything else was bad." Despite speaking to many witnesses, including a "woman in Idaho" (Greathouse) and Wenke, trial counsel maintained that "[n]obody was a favorable witness for John Bejarano." Thus, instead of calling any character witnesses, trial counsel prepared Bejarano himself "to get up and plead for his life."

This was not a reasonable strategic choice, especially given Bejarano's testimony at the guilt phase. And it turned out to be disastrous. Bejarano's testimony at best "inflamed the jury," and, at worst, invited the jury to sentence him to death. Bejarano told the jury: "You better pray to God I don't get out"; and suggested that "the other things if you guys ever found out about, I'd be executed five times." When asked how he would respond if he received a death sentence, he said he would "probably thank you, you know, because you're doing me a favor. You're doing everybody else a favor." Following this devastating presentation, trial counsel's closing argument could only be described, at best, as dispirited: "I tried to present some sort of a picture for you of what the defendant is like, and I was not successful in doing that." The jury deliberated for only four and a half hours before it sentenced Bejarano to death.

## B.

Trial counsel's later characterization of the available character witness testimony was plainly incorrect. Greathouse, the "woman in Idaho" with whom both trial counsel and his investigator spoke, employed Bejarano for two years. She and her husband held him in such high regard that they allowed him to move into their home where he helped to take care of Mr. Greathouse until his death. She was prepared to speak to his good character, specifically noting that while he had access to their jewelry, money, and guns, he never took any of it. She told the defense investigator about a loan she provided him, which he promptly repaid, and described his strong work ethic and regular attendance at church. Greathouse also told the defense investigator anecdotes about good deeds Bejarano did for others, including an incident while he was on vacation with her family, where he dove repeatedly into freezing water to help a stranger recover his boat trailer. Greathouse not only expected to testify on Bejarano's behalf, she was "very desirous of being called," and she believed that Bejarano was "worth saving." Trial counsel acknowledged years later that Greathouse might have been a beneficial witness at the penalty phase, but he defended his decision not to call her by saying, "by the time that we got to that stage of the proceedings [the death penalty] was pretty much of a foregone conclusion."

Similarly, Wenke and his family were prepared and "eager to be called" to testify on Bejarano's behalf and considered him "a member of their family." Wenke and Bejarano met at the mission where Wenke worked, and they developed a close, personal friendship over the course of about two years. Wenke brought Bejarano into his home and gave him access to his car and motorcycle, something he had

never done with any other person he worked with.  He could speak to Bejarano's employment during that time, and he fondly discussed the close relationship Bejarano developed with his wife and children.  The entire Wenke family was willing to travel from Kansas to Nevada to testify on Bejarano's behalf.  Trial counsel acknowledged getting in touch with Wenke, but stated that Wenke was "a transient" who fell out of contact.  In point of fact, however, Wenke remained available at the same telephone number throughout the entire period.  Trial counsel agreed that he might have confused Wenke with someone else but maintained that even if it might have been appropriate to call Wenke to testify, "nothing would have helped."

## II.

### A.

"Capital defendants have a constitutional right to the effective assistance of counsel at the guilt and penalty phases of trial."  *Avena*, 932 F.3d at 1247; *see Strickland v. Washington*, 466 U.S. 668, 686–87 (1984). "Th[e] need for effective counsel is especially acute where, as here, the deficient performance is the difference between life and death." *Waidla v. Davis*, 126 F.4th 621, 649 (9th Cir. 2024) (per curiam) (Wardlaw, J., dissenting).  And "[m]itigation evidence in capital sentencing is 'constitutionally indispensable.'"  *Avena*, 932 F.3d at 1251 (citation omitted).[1]

---

[1] The *Strickland* Court declined to create a checklist for judicial evaluation of attorney performance on the rationale that it could "distract counsel from the overriding mission of vigorous advocacy."  466 U.S. at 689.  However, we look to "prevailing professional norms" when

As the majority recognizes, trial counsel could have easily called Greathouse and Wenke, who would have testified positively to Bejarano's character. *See* Maj. Op. at 35 ("As with Greathouse, it is unclear from the record what tactical concerns motivated trial counsel not to call Wenke to testify during the sentencing phase. Trial counsel was aware of both witnesses, and that these witnesses would testify for Bejarano."). But the majority does not hold that trial counsel's performance was deficient and instead affirms the denial of this claim for lack of prejudice. *Id.* at 35–36.

Although *Strickland* allows us to bypass the deficiency prong of the analysis if a defendant was not prejudiced, 466 U.S. at 697, we have at times made findings on deficient performance even in the absence of prejudice to emphasize significant failings by trial attorneys. *See, e.g., Ross v. Davis*, 29 F.4th 1028 (9th Cir. 2022) (discussing deficient performance at length before upholding the California Supreme Court determination that there was no prejudice). Here, even though his attorney's belief that this was a hopeless case did not ultimately result in *Strickland* prejudice, that belief resulted in trial counsel's failure to make the effort to introduce the available favorable character evidence. This deficient performance cannot be excused by counsel's belief that the death penalty is inevitable. Such a finding would conflate the two, distinct prongs of *Strickland*

---

evaluating an attorney's performance. *Carter v. Davis*, 946 F.3d 489, 502 (9th Cir. 2019) (per curiam) (citation omitted). The 1987 National Legal Aid and Defender Association Standards for the Performance of Counsel in Death Penalty Cases 11.8.6 reveal that contemporaneous guidelines describing appropriately vigorous advocacy in a death penalty case include presenting "to the sentencing entity . . . all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence."

into a circular argument. *See Andrews v. Davis,* 944 F.3d 1092, 1116 (9th Cir. 2019) (en banc) ("Though the deficiency analysis may shed light on the prejudice analysis, it is improper to simply conflate the two."). Thus, it is important to clarify that, even in the absence of a showing of prejudice, an attorney's hopelessness about his cause may not intrude upon his duty to zealously advocate for his client.

## B.

Predicated on the strong presumption of competence, we have often indulged in post hoc rationalization on behalf of trial attorneys. "The Court of Appeals [is] required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [trial] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (quotation marks and citations omitted). However, a court's tendered justifications for "counsel's decisionmaking" may not "contradict[] the available evidence of counsel's actions." *Harrington v. Richter*, 562 U.S. 86, 109 (2011); *see also Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003). Our deference to counsel's judgments and willingness to supply rationales only apply where counsel actually "*made* a judgment." *White v. Ryan*, 895 F.3d 641, 667 (9th Cir. 2018) (declining to engage in post hoc rationalization of an attorney's failure to request a client's records because he testified that he "just flat didn't think of it"). And although the *Strickland* presumption of attorney competence is generous in dealing with "strategic" choices, 466 U.S. at 681, it is overcome where there is no articulated or conceivable strategy.

Here, we cannot engage in a post hoc rationalization of trial counsel's decision against calling Greathouse and

Wenke because his own statements demonstrate that he lacked any strategic reason not to do so.[2]  When questioned about his decision not to call the seemingly only two witnesses in the world who were willing and able to defend Bejarano's character and plead for his life, trial counsel had no explanation.  He admitted that Greathouse "might have been" a beneficial witness, but he offered no strategic reason for failing to call her.  Similarly, he had no explanation for why he did not call Wenke, other than an erroneous, later-retracted statement about losing touch.  Instead, trial counsel testified that he did not call them, and did not need to call them, "[b]ecause nothing would have helped [Bejarano]."  In his words, the death sentence was a "foregone conclusion," and he "could have paraded the cardinals and the bishops in, and I don't think it would have helped this guy."  Thus, any theoretical strategy that we could conceive of would contradict trial counsel's own statements that his only rationale for failing to call these witnesses was his own hopelessness.

## C.

Giving up is never a reasonable trial strategy.  The idea that there would be a case or a client so difficult that an attorney would be absolved of his duty to advocate flies in the face of our adversarial system.  The availability of an

---

[2] Moreover, unlike in *Darden v. Wainwright*, 477 U.S. 168, 186 (1986), where counsel's limited mitigation presentation was justified because "[a]ny attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of [his] prior convictions," Bejarano's extensive criminal history had already been heard by the jury.  Failing to call these additional witnesses did not insulate the jury from additional information about Bejarano's violent history.  Instead, it only ensured that they would not hear any evidence of good conduct to balance that existing image.

ineffective assistance claim derives from the necessity of "render[ing] the trial a reliable adversarial testing process" in which it is counsel's "overarching duty to advocate the defendant's cause." *Strickland*, 466 U.S. at 688; *see also United States v. Cronic*, 466 U.S. 648, 654 (1984) ("If no actual 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been violated.").

The Supreme Court has repeatedly held that attorneys are not excused from their obligation to advocate for their clients simply because they feel hopeless. Instead, they must make strategic choices in an effort to address the weaknesses of their case. For instance, in *Strickland*, the Court acknowledged that trial counsel "understandably felt hopeless about respondent's prospects" after his client confessed to several murders, against his advice. *Strickland*, 466 U.S. at 699. Similarly, the Court described that counsel in *Pinholster* "confronted a challenging penalty phase with an unsympathetic client, which limited their feasible mitigation strategies. By the end of the guilt phase, the jury had observed Pinholster glory in his criminal disposition and hundreds of robberies." *Pinholster*, 563 U.S. at 193. But, in both of those cases, the difficult nature of the defendants supported counsels' respective strategic determinations—in *Strickland*, a decision to rely on his client's acceptance of responsibility in lieu of character evidence, and in *Pinholster*, a decision to rely solely on family sympathy in the penalty phase presentation.

Trial counsel made no such strategic choice. Although he testified that he focused his entire defense at both the guilt and penalty phases on humanizing Bejarano and avoiding the death penalty, he failed to present the readily available mitigating evidence that would have supported this purported strategy. Unlike in *Strickland*, where "nothing in

the record indicate[d] . . . that counsel's sense of hopelessness distorted his professional judgment," 466 U.S. at 699, trial counsel acknowledged that his decision not to call the witnesses hinged on his opinion that nothing could have helped Bejarano. But trial counsel's concerns about the difficulty of the case, and his belief that his client "had already sunk the ship," did not permit him to entirely abdicate his role as advocate.

## III.

I agree with majority's conclusion that the failure to call these character witnesses did not ultimately prejudice Bejarano. His only argument that he was prejudiced—that he would not have testified at the penalty phase had counsel produced favorable character witnesses—is belied by the fact that he testified in the guilt phase over counsel's objection. And that testimony was itself prejudicial to his defense.

But this does not absolve trial counsel of his duty to advocate for his client. Even if a defense attorney feels hopeless, or assumes that his client is guilty, our adversarial system demands that he nonetheless find a way to advocate for his client. Here, a readily available means of placing Bejarano's good attributes before the jury slipped through trial counsel's grasp. His failure to present the available mitigating evidence was deficient performance; and we are left merely to speculate how, or whether, that evidence might have spared Bejarano the death penalty.